648 A.2d 439

TANDRA S.

v.

TYRONE W.

**BALTIMORE CITY OFFICE OF CHILD SUPPORT ENFORCEMENT, STATE of Maryland, DEPARTMENT OF HUMAN RESOURCES**

v.

JOHN S., JR.

Nos. 144, 157, Sept. Term, 1993.

Court of Appeals of Maryland.

Oct. 7, 1994.

304

Joseph B. Spillman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief) Baltimore, for appellant in No. 144 and petitioner in No. 157.

Harry Sadoff, Cambridge, for appellee in No. 144.

La'Vern D. Wiley, (Allen T. Eaton, Eaton, McClellan & Allen, all on brief) Washington, DC, for respondent in No. 157.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

These companion cases present the question whether a court can vacate an enrolled paternity judgment based on the results of a post-judgment blood test or based on the mother's post-judgment testimony that the judicially determined father is not in fact the father.

## I

## A

### Case Number 144

On August 31, 1990, Tandra S. gave birth to T.W., a baby girl. Tyrone W. and Tandra executed a paternity agreement on October 19, 1990 in which Tyrone acknowledged his paternity of T.W. In this agreement, Tyrone agreed to pay child support and a portion of the child's medical expenses. In addition, the agreement provided that Tandra would have custody and guardianship of T.W., while Tyrone would have reasonable visitation rights.

On October 26, 1990, Tandra filed a paternity complaint in the Circuit Court for Talbot County alleging Tyrone's paternity of T.W., and incorporating the paternity agreement.[1] Pursuant to the parties agreement, the court entered a final judgment on October 30, 1990, entitled "Paternity Declaration," which established Tyrone's paternity of T.W. The judgment, following the dictate of the agreement, required Tyrone to pay $10.00 per week to Tandra for child support and also ordered him to pay one-half of the child's medical expenses not covered by insurance.

---

1. The paternity complaint also contained the following "Notice to Defendant" issued by the Office of the State's Attorney for Talbot County:

"It is your right to have the issue of paternity tried by a jury. Unless you elect a jury trial, your right to such trial will be waived, and the case will be tried by the Court. This request for a jury trial should be filed on or before the date set for a hearing of this matter."

Approximately two and one-half years later, on April 1, 1993, Tyrone filed a motion to set aside the judgment of paternity and a request for blood tests. In the motion, he stated that Tandra had recently informed him that he was not T.W.'s father. Tandra responded in opposition to the motion asserting that the 1990 declaration of paternity was a final judgment and as such could not be disturbed after two and one-half years. Tandra also filed a motion for summary judgment, arguing that the judgment of paternity could not be set aside absent fraud, mistake or irregularity. Tyrone responded with a "Motion to Dismiss Motion for Summary Judgment of Paternity and Renewal of Motion to Set Aside Judgment of Paternity." In this pleading, he contended that there was indeed a mistake in the case, *i.e.*, he was mistakenly named the father of the child.

On April 9, 1993, prior to any judicial hearing, the circuit court ordered the parties and the child to submit to blood tests. The results of the blood tests excluded Tyrone as a potential father.

A hearing was then held in June of 1993 regarding Tyrone's motion to set aside the paternity judgment.[2] The circuit court (Horne, J.) initially noted that Maryland Rule 2–535 limits a court's right to vacate or modify an enrolled judgment. In particular, it explained that Rule 2–535(b) permits a court to "exercise revisory power and control over [an enrolled] judgment [only] in case of fraud, mistake, or irregularity."

The court determined that Tyrone had failed to establish fraud, mistake, or irregularity. It also said that it should not have granted the motion for blood test without first holding a

---

2. At the hearing, Tandra's attorney explained the procedures used by the Office of the State's Attorney for Talbot County when a person is named as a defendant in a paternity action. She stated that, in 1990, Tyrone W. received an appointment letter from the State's Attorney's office which advised him of his right to contest paternity, to request a jury trial, and to obtain counsel. In addition, Tyrone was informed that he had a right to have a blood test. The court concluded that the Office of the State's Attorney had properly advised Tyrone of his rights in 1990.

hearing, and would not, in the future, order post-judgment blood tests. Nevertheless, the circuit court granted Tyrone's motion to set aside the paternity judgment because it concluded that it would be unjust to force Tyrone to continue paying child support after it had been scientifically proven that he was not the child's father. As a result of the paternity judgment being vacated, the child was left fatherless. We granted certiorari prior to consideration of the appeal by the intermediate appellate court.

## B

### *Case Number 157*

On September 21, 1985, Vandella H. gave birth to John S., III. Vandella filed a paternity petition in the Circuit Court for Baltimore City on November 21, 1985, naming John S., Jr. as the father of her child. During the paternity proceedings in March of 1986, John and Vandella each testified that John was the father of the child.[3] John was not represented by counsel at this hearing. On April 9, 1986, the circuit court entered a decree declaring John to be the father of the child; it also ordered him to pay $25.00 per week in child support and $2.00 per week for reimbursement to the State's Medical Assistance Program.

On October 26, 1987, Vandella filed a petition for change of name in the Circuit Court for Baltimore City, requesting that her child's name be changed from John S., III to S.A.S., in order "to reflect his true lineage and parentage." In this petition, Vandella stated that Randy S., not John, was the "actual father" of her child. The alleged natural father, Randy, consented to the passage of an order changing the child's birth certificate to show that he was the "true and legal father" of the child. It is unclear whether John received

---

**3.** In his brief, John claims that, at the 1986 hearing, he was asked "if he would support the child" but was never asked whether he was the father of the child.

notice of this change of name proceeding.[4] According to Vandella, the Circuit Court for Baltimore City granted her request to change her child's name on March 14, 1988.

Shortly after the change of name proceeding, Vandella informed John that he was not the father of the child, admitted to him that she had falsified the paternity petition in 1985, and admitted to him that she had committed perjury in the original paternity proceeding. Vandella and John thereafter contacted the Department of Social Services on several occasions in an attempt to terminate John's child support payments. None of these requests were granted.

On March 19, 1992, approximately six years after the enrollment of the paternity judgment and approximately four years after the child's name change, John filed a motion to vacate the paternity judgment, or in the alternative, to modify child support. The Baltimore City Office of Child Support Enforcement (BCOCSE) moved to intervene, arguing that no party was adequately representing the interests of the Department of Social Services of Baltimore City. It also averred that the 1986 decree could not be revised because John's motion to vacate failed to allege any fraud, mistake, or irregularity. BCOCSE was permitted to intervene in the case.[5]

At a hearing on October 26, 1992 in the Circuit Court for Baltimore City, Vandella stated that she last had sexual relations with John in September of 1984, approximately one year before her child was born. Notwithstanding the funda-

---

**4.** Vandella stated that John was notified of the change of name request, but John denied knowledge of the proceeding and asserted that he was not served with a copy of the petition. In the record, the only reference to service or notice is an "Order for Notice by Posting," which indicates that a copy was to be posted in the vicinity of the Baltimore City Circuit Court House.

**5.** BCOCSE also asked the court to appoint an independent attorney to represent the best interests of the child. The court, however, determined that "bringing in an independent attorney to represent the interests of the child would be fruitless." The parties do not appear to challenge the ruling denying the appointment of an independent attorney; thus, the issue is not before us.

mental principles of biology, she testified that John believed her when she informed him that he was the child's father. She further testified that she resumed her relationship with John in February of 1985.

According to Vandella, she had a brief relationship with Randy in December of 1984, which resulted in the birth of the child whose paternity is at issue in this case. She described Randy as "not a serious boyfriend," but admitted that Randy was also the father of another child later born to her in 1988. Randy, a resident of New Jersey, was not made a party to the proceeding below. Neither Randy nor John testified at the hearing below and neither man submitted to a blood test to determine paternity.

On the same day as the hearing took place, the circuit court (Byrnes, J.) issued an order, which vacated the 1986 paternity judgment and released John from all support obligations. It reasoned that because the mother, the "real father," and John, the "adjudicated father," all agreed that John was mistakenly named the father in 1986, it would be in the interests of justice to set aside the judgment. The court did not concurrently establish paternity in another man; thus, the child was left fatherless.

BCOCSE appealed to the Court of Special Appeals and that court, in an unreported opinion, affirmed the judgment of the circuit court. The intermediate appellate court held that, notwithstanding the circuit court's limited revisory powers as set forth by our cases, Maryland Rule 2–535(b), § 6–408 of the Courts and Judicial Proceedings Article, and § 5–1038(a) of the Family Law Article, the circuit court properly vacated the prior paternity judgment because it "avoide[d] paramount inequity."

In particular, the court found that § 5–1007 of the Family Law Article governed the case. That section provides that "[a]ny rule of court or statute that relates to procedure applies to a proceeding under this subtitle only to the extent that the rule or statute is: (1) practical under the circumstances; and

(2) not inconsistent with this subtitle."[6] The court determined that the "limitations on the court's revisory power, imposed by Rule 2–535(b) and CJ § 6–408, are impractical in light of the specific circumstances" of the case. It concluded that "[t]o compel a person, who is not the father of a child, to continue paying support for that child when the child's mother, the child's biological father, and the alleged father agree on the issue of paternity, and the child's birth certificate and name have been changed to reflect his true parentage, perpetuates injustice and defies common sense." Accordingly, the court held that the circuit court had not abused its revisory powers.[7]

## II

Before us, the Attorney General appeared on behalf of petitioner, Tandra, in case no. 144, and petitioner, BCOCSE, in case no. 157. He observes that enrolled judgments may only be revised in limited circumstances, *i.e.*, for fraud, mistake, or irregularity. The Attorney General maintains that neither fraud, mistake, nor irregularity, as those terms have been defined through judicial decision, existed in these cases. He avers that these strict revisionary rules apply with equal vigor to paternity judgments.

According to the Attorney General, the purpose of this limited revisory power is to promote the finality of judgments thereby ensuring that there is an end to litigation. Even though the necessity for finality may at times lead to harsh results, he asserts that the public policy favoring finality overrides the occasional unfairness that results in particular cases. He further posits that the majority of other jurisdic-

---

**6.** "Subtitle" as used in that section refers to the paternity proceedings subtitle, §§ 5–1001 *et. seq.*, in the Family Law Article.

**7.** The Court of Special Appeals also decided, *sua sponte,* that the child was the victim of extrinsic fraud and therefore the trial court was authorized to revise the judgment pursuant to Rule 2–535(b), if that rule was applicable.

tions support giving conclusive effect to a judicial finding of paternity.

The Attorney General also claims that the doctrine of *res judicata* precludes a court from revisiting a paternity judgment when the same parties were involved in the original proceeding. Moreover, he contends that the circuit court, in each of the two cases, and the Court of Special Appeals in case no. 157, failed to protect the interests of the two children by vacating the paternity decrees without concurrently establishing paternity in another man.

As to case no. 144, it is contended that the overwhelming majority of out-of-state authorities reject attempts to reopen paternity judgments based on post-judgment blood tests. On the other hand, Tyrone argues that the circuit court properly set aside the paternity judgment because of the blood test results and the mother's perjury in the original paternity hearing. He avers that, based on the results of the blood test and his affidavit stating that the mother informed him that he was not the father of the child, it would be an injustice if he was required to continue to support another man's child. In addition, Tyrone contends that he was "mistakenly" made the father and therefore the circuit court properly set aside the enrolled paternity judgment.

As to case no. 157, the Attorney General points out that even if fraud, mistake, or irregularity is established by clear and convincing evidence, a motion to revise an enrolled judgment will only succeed if the moving party acted in good faith and with ordinary diligence. He argues that John failed to act with ordinary diligence by waiting over four years after the child's name change before filing a motion to vacate the paternity judgment. Thus, it is maintained that even if fraud, mistake or, irregularity existed in case no. 157, the original paternity judgment cannot be disturbed because John failed to pursue revision with ordinary diligence.

John argues that the circuit court and the Court of Special Appeals properly found that extrinsic fraud existed and that the paternity decree could be set aside. He contends that the

lower courts correctly determined that he acted with ordinary diligence as he attempted to have the paternity decree revised immediately after becoming aware that the child's name had been changed. According to John, with the assistance of Vandella, the mother, he sought relief at the Department of Social Services after learning that he was not the father. These actions proved fruitless, John maintains, and the paternity judgment remained in effect. It was only after the decision below that his support obligations finally ceased. Therefore, he claims that he acted with ordinary diligence at all times.

He also asserts that a child should not be deprived of his right to his true parentage, lineage, and heritage, absent legal adoption, solely to satisfy the State's interest in finality. He believes that the identity of the child's biological father is known in this case and that the child has a right to know who his biological father is. In addition, he contends a child has a right to establish an uninhibited father/son relationship with his biological father.

### III

A circuit court has unrestricted discretion to revise a judgment within thirty days after it is entered. *See* Md. Rule 2–535(a); *Platt v. Platt,* 302 Md. 9, 13, 485 A.2d 250 (1984); *Haskell v. Carey,* 294 Md. 550, 557, 451 A.2d 658 (1982). *See also* Maryland Code (1974, 1989 Repl.Vol.) § 6–408 of the Courts and Judicial Proceedings Article ("[f]or a period of 30 days after the entry of a judgment, ... the court has revisory power and control over the judgment"). As earlier indicated, Maryland Rule 2–535(b) provides that, after thirty days, a judgment becomes enrolled and may be revised only upon a showing of fraud, mistake, or irregularity.[8] *See also* § 6–408 of the Courts Article ("[a]fter the expiration of [thirty days,] the court has revisory power and control over the judgment

---

8. In addition, subsection (d) of Rule 2–535 provides that an enrolled judgment may be revised if a clerical error has occurred. In the instant case, clerical error is not a concern.

only in case of fraud, mistake, irregularity, or failure of an employee of the court or of the clerk's office to perform a duty required by statute or rule"). The rationale behind strictly limiting a court's revisory power is that in today's highly litigious society, there must be some point in time when a judgment becomes final. *See Andresen v. Andresen,* 317 Md. 380, 387–88, 564 A.2d 399 (1989); *Haskell, supra,* 294 Md. at 558, 451 A.2d 658. *See also Schwartz v. Merchants Mort. Co.,* 272 Md. 305, 308, 322 A.2d 544 (1974) ("Underlying this long settled rule is the principle that, once parties have had the opportunity to present before a court a matter for investigation and determination, and once the decision has been rendered and the litigants, if they so choose, have exhausted every means of reviewing it, the public policy of this State demands that there be an end to that litigation.").

A court, however, will only exercise its revisory powers if, in addition to a finding of fraud, mistake, or irregularity, the party moving to set aside the enrolled judgment has acted with ordinary diligence, in good faith, and has a meritorious defense or cause of action. *See J.T. Masonry v. Oxford,* 314 Md. 498, 506, 551 A.2d 869 (1989) and cases cited therein. Moreover, it is well established that there must be clear and convincing evidence of the fraud, mistake, or irregularity before a movant is entitled to have a judgment vacated under Rule 2–535(b). *See Accrocco v. Splawn,* 264 Md. 527, 532, 287 A.2d 275 (1972); *Himes v. Day,* 254 Md. 197, 202, 254 A.2d 181 (1969).

It is also well settled that Rule 2–535(b) generally applies to all final judgments. *See Owen v. Freeman,* 279 Md. 241, 245, 367 A.2d 1245 (1977); *Owl Club v. Gotham Hotels,* 270 Md. 94, 100, 310 A.2d 534 (1973). An order declaring paternity is a final judgment and is subject to revision only in the manner and to the extent that any order or decree is subject to the revisory power of the court. *See* Maryland Code (1984, 1991 Repl.Vol.) § 5–1038(a) of the Family Law Article; *Adams v. Mallory,* 308 Md. 453, 463, 520 A.2d 371 (1987) ("The purpose of § 5–1038 is to make plain that princi-

ples of continuing jurisdiction apply to orders in paternity cases, *other than to the determination of paternity itself which remains subject to the ordinary rules governing revision.*") (emphasis added). Therefore, Rule 2–535 clearly governs the instant case.

Nevertheless, the Court of Special Appeals in case no. 157 concluded that § 5–1007 of the Family Law Article controlled the issues in the case. That section provides that any rule or statute, when used in the context of a paternity case, applies only to the extent that the rule or statute is: (1) practical under the circumstances; and (2) not inconsistent with the paternity subtitle. The intermediate appellate court determined that the "limitations on the court's revisory power . . . [were] impractical in light of the specific circumstances" of the case. We disagree. A harsh result or an unfair decision is not equivalent to impracticality.

As we see it, the Court of Special Appeals failed to consider § 5–1038(b) of the Family Law Article, which states that judgments relating to paternity, *other than a declaration of paternity,* may be modified or revised if the court finds that it would be "just and proper in light of the circumstances." Reading §§ 5–1038(a) and (b) together, it is clear that the more liberal revisory rule, § 5–1038(b), governs orders relating to paternity, but does not control the declaration of paternity itself. Rather, § 5–1038 read in its entirety makes it plain that paternity judgments are governed by the strict revisory rules set forth in Rule 2–535.

The terms fraud, mistake, and irregularity, as used in Rule 2–535 and its predecessor, Rule 625a, have been thoroughly defined by our cases. It is evident from these decisions that those terms are to be narrowly defined and strictly applied. *See Autobahn v. Baltimore,* 321 Md. 558, 562, 583 A.2d 731 (1991); *Platt, supra,* 302 Md. at 13, 485 A.2d 250.

The type of fraud necessary to vacate an enrolled judgment is extrinsic fraud, not fraud which is intrinsic to the trial of the case itself. *See Hamilos v. Hamilos,* 297 Md. 99, 105, 465 A.2d 445 (1983). In *Hresko v. Hresko,* 83 Md.App.

228, 232, 574 A.2d 24 (1990), the Court of Special Appeals clearly distinguished intrinsic and extrinsic fraud:

> "Intrinsic fraud is defined as '[t]hat which pertains to issues involved in the original action or where acts constituting fraud were, or could have been, litigated therein.' Extrinsic fraud, on the other hand, is '[f]raud which is collateral to the issues tried in the case where the judgment is rendered.'

> "Fraud is extrinsic when it actually prevents an adversarial trial. In determining whether or not extrinsic fraud exists, the question is not whether the fraud operated to cause the trier of fact to reach an unjust conclusion, but whether the fraud prevented the actual dispute from being submitted to the fact finder at all." (quoting in part *Black's Law Dictionary* (5th ed. 1979)).

*See also Schwartz, supra,* 272 Md. at 309, 322 A.2d 544 ("fraud is extrinsic when it actually prevents an adversarial trial, but is intrinsic when it is employed during the course of the hearing which provides the forum for the truth to appear").

In *Schwartz, supra,* 272 Md. at 308, 322 A.2d 544, we provided examples of intrinsic fraud which will not trigger a court's revisory power: "an enrolled decree will not be vacated even though obtained by the use of forged documents, perjured testimony, or any other frauds which are 'intrinsic' to the trial of the case itself." We also discussed examples of extrinsic fraud which will permit a court to revise an enrolled judgment:

> " 'Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side,—these, and similar cases which show that there has

never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing.'"

*Id.* at 309, 322 A.2d 544 (quoting *United States v. Throckmorton,* 98 U.S. 61, 65–66, 25 L.Ed. 93 (1878)).

■ It is well settled that "mistake" as used in Rule 2–535(b) is limited to a jurisdictional error, *i.e.* where the court has no power to enter the judgement. *See Hamilos, supra,* 297 Md. at 107, 465 A.2d 445. The typical kind of mistake occurs when a judgment has been entered in the absence of valid service of process; hence, the court never obtains personal jurisdiction over a party. *See Miles v. Hamilton,* 269 Md. 708, 714, 309 A.2d 631 (1973) (no valid service of process); *Harvey v. Slacum,* 181 Md. 206, 210–11, 29 A.2d 276 (1942) (default judgment entered where there had been no valid service of process). In *Hughes v. Beltway Homes, Inc.,* 276 Md. 382, 347 A.2d 837 (1975), we cited numerous examples of mistakes, not jurisdictional in nature, which would not permit a court to exercise its revisory power:

a mechanics' lien foreclosure case making reference to the wrong lot; a mistaken belief by out-of-state counsel that the Maryland procedure relative to attachment was similar to that in his state, which belief brought about a judgment by default; a mistake of the agents and counsel of a complaining party; a failure to attach a ledger card to an affidavit with a motion for summary judgment or the failure of counsel to file an appropriate pleading prior to the expiration of the time specified by rule; a finding that a judgment by default was based upon vouchers, some of which were in the name of the defendant, some in the name of a corporation, and some in the name of another person; a mistaken determination that summary judgment should be entered against a defendant; or a failure by defendants to inform their attorneys of the defenses that they had.

*Id.* at 386–87, 347 A.2d 837. From this catalogue of examples, it is clear that the term "mistake," as used in Rule 2–535(b),

does not mean a unilateral error of judgment on the part of one of the parties. Rather, as we have previously stated, mistakes justifying a revision under the Rule are confined to jurisdictional mistakes.

 Irregularity, as used in Rule 2–535(b), has been defined as "the doing or not doing of that, in the conduct of a suit at law, which, conformable to the practice of the court, ought or ought not to be done." *Weitz v. MacKenzie*, 273 Md. 628, 631, 331 A.2d 291 (1975) and cases cited therein. As a grounds for revising an enrolled judgment, irregularity, as well as fraud and mistake, has a very narrow scope. *See Autobahn, supra*, 321 Md. at 562, 583 A.2d 731. In *Weitz, supra*, 273 Md. at 631, 331 A.2d 291, we explained that:

> "irregularity, in the contemplation of the Rule, usually means irregularity of process or procedure ... and not an error, which in legal parlance, generally connotes a departure from truth or accuracy of which a defendant had notice and could have challenged."

An example of an irregularity that would permit a court to set aside a judgment existed in *Maryland Lumber v. Savoy Constr. Co.*, 286 Md. 98, 405 A.2d 741 (1979). In that case, we held that the failure of a clerk to notify a party of an entry of judgment constituted an irregularity, justifying the court to set aside the enrolled judgment. *Id.* at 100–01, 405 A.2d 741.

The cases before us today involve two competing interests: (1) the policy underlying Rule 2–535 that enrolled judgments are intended to be final and determine all claims between the parties and (2) the fundamental goal of our judicial system— the ascertainment of truth. To resolve the issues in these two cases, we must balance these competing interests.

## IV

### A

*Case Number 144*

 Tyrone appears to argue that the circuit court properly vacated the original paternity judgment because both fraud

and mistake occurred. First, he contends that the blood test excluded him and thus he was "mistakenly" adjudicated to be T.W.'s father. Second, he asserts that the mother's false statements in the original paternity complaint constituted fraud.

As detailed above, an enrolled judgment will only be vacated for mistake if the mistake is jurisdictional. In this case, Tyrone never alleged a jurisdictional mistake; rather, the only mistake he points to is the mistake which declared him to be the father.

In *Preissman v. City of Baltimore,* 64 Md.App. 552, 558, 497 A.2d 826 (1985), *cert. denied,* 305 Md. 175, 501 A.2d 1323 (1986), the Court of Special Appeals said:

"The meaning of 'mistake' was discussed by this court in *Bernstein v. Kapneck,* 46 Md.App. 231, 417 A.2d 456 (1980), *aff'd,* 290 Md. 452, 430 A.2d 602 (1981). Factually, that case involved an auto tort with personal injuries, settled by the parties. It was later learned that one of the plaintiffs received a brain injury, a fact not known at the time of settlement. Plaintiffs then filed a motion to set aside premised upon their mistake as to the extent of injuries. The motion was denied and the court noted that 'the mistake must necessarily be confined to those instances where there is a jurisdictional mistake involved.'"

Similarly, in the instant case, the fact that the parties later learned that Tyrone was not the father of the child was not a jurisdictional mistake; consequently, the circuit court was without authority to set aside the enrolled paternity judgment on the basis of mistake.

The mother's perjury in the 1990 paternity proceeding also may not serve as a basis for vacating the paternity decree. Her statement in the original paternity complaint that Tyrone was the father was obviously intrinsic to the proceeding, *see Schwartz, supra,* 272 Md. at 308, 322 A.2d 544, which does not implicate a court's revisory power under Rule 2–535(b). Extrinsic fraud, of course, entitles a party to have an enrolled judgment set aside, but Tyrone was not the subject of extrin-

sic fraud. He was not prevented from having a full adversarial proceeding in the original paternity action. It was his choice to sign the paternity agreement in 1990 and there is nothing in the record which indicates that he signed this document under any coercion or duress. Consequently, Tyrone is bound by his actions in 1990 and, more specifically, he is bound by the 1990 judgment.

Tyrone filed his motion to set aside the paternity judgment in April of 1993, over two years after the paternity decree was entered. He had full knowledge of the original paternity complaint, and he knowingly waived his right to counsel, a blood test, a trial by judge or jury, and the right to call and cross-examine witnesses. He had every opportunity to present his defense in court; he may not now attempt to litigate the central issue of paternity after the decree has become enrolled.

The blood tests, which the circuit relied on in vacating the judgment, do not alter this result. Rule 2–535(b) provides a circuit court with very limited revisory powers. The results of the blood test did not change the unambiguous mandate that exists in the revisory rule. Therefore, the circuit court erred when it vacated the 1990 paternity judgment and left the child fatherless because, as the circuit court itself recognized, neither fraud, mistake, nor irregularity had occurred. The majority of decisions from other jurisdictions similarly reject attempts to reopen paternity judgments based on post-judgment blood tests. *See, e.g., Ex parte W.J.,* 622 So.2d 358 (Ala.1993); *Roddenbery v. Roddenbery,* 255 Ga. 715, 342 S.E.2d 464 (1986); *Hackley v. Hackley,* 426 Mich. 582, 395 N.W.2d 906 (1986); *Clay v. Clay,* 397 N.W.2d 571 (Minn.Ct. App.1986), *appeal dismissed,* 484 U.S. 804, 108 S.Ct. 49, 98 L.Ed.2d 14 (1987); *Watson v. State of Oregon,* 71 Or.App. 734, 694 P.2d 560 (1985); *Wachter v. Ascero,* 379 Pa.Super. 618, 550 A.2d 1019 (1988); *Manze v. Manze,* 362 Pa.Super. 153, 523 A.2d 821 (1987); *Slagle v. Slagle,* 11 Va.App. 341, 398 S.E.2d 346 (1990).

B

*Case Number 157*

John argues that the mother's perjury during the 1986 paternity proceeding was extrinsic fraud, justifying the circuit court's decision to vacate the 1986 paternity judgment. As noted above, however, perjury constitutes intrinsic fraud, which is not a ground for revising a judgment under Rule 2–535(b).

In *Watson v. State of Oregon, supra,* 694 P.2d at 561, the following similar facts existed:

"During the [original paternity action in 1980, the mother] testified in a deposition that plaintiff is the father of her child and that she had not had sexual relations with any one other than plaintiff during the probable time of conception. Plaintiff did not seek blood tests during that proceeding. . . . Instead of litigating the issue of his paternity, he stipulated that he is the father. The court entered a judgment. Plaintiff did not appeal.

"In 1982, plaintiff experienced doubts as to his paternity and arranged to have blood tests performed on himself, the child and mother. The results of those tests exclude plaintiff as the biological father. In his complaint in this proceeding, plaintiff alleged that he 'was prevented from impeaching the paternity and the judgment of paternity by the fraud [of the mother].' "

There, the Court of Appeals of Oregon concluded:

"The fraud of which plaintiff complains, perjured deposition testimony, was intrinsic to the proceeding below, because it concerned the very issue in dispute, and cannot provide the basis for setting aside the judgment. Although plaintiff may have been induced by the mother's deposition to stipulate to a judgment, he was not *prevented* from disputing her testimony and attempting to disprove his paternity. The strong policy favoring the finality of litigation dissuades us from allowing plaintiff to upset a judgment to which he

consented without seeking to present evidence on the disputed issue."

*Id.* 694 P.2d at 563 (emphasis in original).

In the instant case, John consented to the paternity determination in 1986. He may not challenge that judgment seven years later in the absence of fraud, mistake, or irregularity. Just as in *Watson, supra,* the only fraud that existed was intrinsic to the original proceeding. Consequently, the circuit court improperly vacated the 1986 paternity judgment.

John relies heavily on the change of name proceeding in 1987 and 1988. But this did not have the effect of nullifying the 1986 paternity judgment, which declared John to be the father; furthermore, it did not vest paternity in Randy. In regard to paternity and as to the parental relationship between John and the child, the name change was meaningless. *See Carroll County v. Edelmann,* 320 Md. 150, 175–76, 577 A.2d 14 (1990) (a court has no authority to terminate a parental relationship other than through a decree of adoption or guardianship). Even if it was the mother's intent to terminate John's child support payments by changing her child's name, the result would be no different. In *Stambaugh v. Child Support Admin.,* 323 Md. 106, 591 A.2d 501 (1991), we made clear that one parent may not waive his or her child's right to support from the other parent. *Id.* at 111–12, 591 A.2d 501. *See also Stancill v. Stancill,* 286 Md. 530, 535, 408 A.2d 1030 (1979) (a court may not be handcuffed in the exercise of its duty to act in the best interests of a child by any agreement between the parents). Therefore, the mother could not unilaterally release John from his support obligations by merely changing her child's name. If the courts below concluded that the name change provided a basis for vacating the 1986 paternity judgment, we disagree.

Moreover, if we were to uphold the lower court's decision in this case, the ramifications could be potentially disastrous. For example, what if the mother in another five years changes her statement again and testifies that John is the father? Should a court at that juncture reinstate the original paternity

judgment? In this regard, the policy of finality serves an important purpose—the parties understand their respective rights and need have no concern about future developments changing their rights.

It is unnecessary in either of these two cases to consider whether the adjudicated fathers acted in good faith or with ordinary diligence because neither fraud, mistake, irregularity, nor clerical error has been established.

## V

There are a number of out-of-state decisions that would support a conclusion that a paternity decree should be set aside in circumstances such as exist in each of these cases. *See, e.g., Ex parte State ex rel. McKinney,* 567 So.2d 366 (Ala.Civ.App.), *mandamus denied,* 575 So.2d 1024 (Ala.1990); *Locklear v. Sampson,* 478 So.2d 1113 (Fla.Dist.Ct.App.1985); *Department of Human Resources v. Browning,* 210 Ga.App. 546, 436 S.E.2d 742 (1993); *Fairrow v. Fairrow,* 559 N.E.2d 597 (Ind.1990); *Spears v. Spears,* 784 S.W.2d 605 (Ky.Ct.App. 1990); *Cain v. Cain,* 777 S.W.2d 238 (Ky.Ct.App.1989); *Crowder v. Com. ex rel. Gregory,* 745 S.W.2d 149 (Ky.Ct.App.1988); *Younkin v. Younkin,* 221 Neb. 134, 375 N.W.2d 894 (1985); *In re Paternity of K.,* 51 Wash.App. 131, 752 P.2d 393 (1988); *Nehls v. Nehls,* 151 Wis.2d 516, 444 N.W.2d 460 (1989). These jurisdictions, however, provide courts with much broader revisory powers. *See Andresen, supra,* 317 Md. at 385–88, 564 A.2d 399 (thoroughly surveying each state's revisory rules). In *Andresen,* we stated:

> "[U]nlike the law in the great majority of states, Maryland law contains no procedural mechanism which would allow a Maryland court to reopen a divorce decree finalized for more than four years. There is no authority under Maryland Law which permits a court to redetermine marital property more than 30 days after the decree becomes enrolled except under specific circumstances. Subsection (b) and (d) of Maryland Rule 2–535 authorize a judgment to

be revised only in case of fraud, mistake, irregularity or clerical errors."

317 Md. at 387, 564 A.2d 399. Similarly, there is no authority under Maryland law which permits a court to revise a paternity judgment after 30 days except in the case of fraud, mistake, irregularity, or clerical error.

It is therefore clear that the overriding policy in Maryland emphasizes that once a case is decided, it shall remain decided with certain very narrow exceptions. Moreover, the majority of decisions from other jurisdictions support giving conclusive effect to a judicial finding of paternity and, therefore, are in accord with our decision today. *See, e.g., Ex parte W.J., supra; Benac v. State,* 34 Ark.App. 238, 808 S.W.2d 797 (1991); *State ex rel. Daniels v. Daniels,* 817 P.2d 632 (Colo.Ct. App.1991); *Division of Child Support Enf. v. Myrks,* 606 A.2d 748 (Del.1992); *Miller v. Cowart,* 546 So.2d 768 (Fla.Dist.Ct. App.1989); *Roddenbery v. Roddenbery, supra; Odle v. Patrick,* 538 A.2d 770 (Me.1988); *Anderson v. Anderson,* 407 Mass. 251, 552 N.E.2d 546 (1990); *Rucinski v. Rucinski,* 172 Mich.App. 20, 431 N.W.2d 241 (1988); *Hackley v. Hackley, supra; Clay v. Clay, supra; In re Marriage of Campbell,* 741 S.W.2d 294 (Mo.Ct.App.1987); *In re Marriage of Holland,* 224 Mont. 414, 730 P.2d 410 (1986); *A.K. v. S.K.,* 264 N.J.Super. 79, 624 A.2d 36 (1993); *Dolan on Behalf of Faye D. v. Jay E.,* 183 A.D.2d 969, 583 N.Y.S.2d 585 (1992); *Withrow v. Webb,* 53 N.C.App. 67, 280 S.E.2d 22 (1981); *State ex rel. Alvarez v. Jiminez,* 98 Or.App. 253, 779 P.2d 175 (1989); *Watson v. State of Oregon, supra; Wachter v. Ascero, supra; Manze v. Manze, supra; Lerman v. Lerman,* 148 Vt. 629, 528 A.2d 1121 (1987); *Slagle v. Slagle, supra; State ex rel. DHHR v. Cline,* 185 W.Va. 318, 406 S.E.2d 749 (1991); *In re L.S.G.,* 170 Wis.2d 231, 487 N.W.2d 644 (1992).

The result in these cases may seem harsh. Indeed, in case no. 144, Tyrone has been excluded as a possible father. Nevertheless, in each case, the "judicially determined father" was advised of all the safeguards the law provides to prevent incorrect decisions, and waived all those rights. It is evident that each man had an adequate opportunity to obtain a fair

and full adjudication of paternity in the original action, but each failed to avail himself of that opportunity. To argue that fairness requires relitigation of the paternity question totally overlooks the fact that the adjudicated fathers in each of these cases did have a chance to contest the paternity issue but did not, choosing instead to accept the paternity determination knowing that they would be required to support their respective children. It also overlooks the unfairness that would occur to the children if the paternity issue were allowed to be relitigated, thereby leaving the children fatherless and without support.

Moreover, we have consistently said that a court's revisory powers do not provide for the amendment of an enrolled judgment on the ground of "fundamental unfairness." *See Platt, supra,* 302 Md. at 14, 485 A.2d 250. We have also emphasized that " 'all the power the courts of this State have to revise and control enrolled judgments and decrees' is embraced by the statute and rules covering the matter." *Id.* at 15, 485 A.2d 250 (quoting in part *Eliason v. Comm'r of Personnel,* 230 Md. 56, 59, 185 A.2d 390 (1962)). *See also Meyer v. Gyro Transp. Systems,* 263 Md. 518, 527, 283 A.2d 608 (1971) (Rule 2–535 "embraces all of the power the court has to revise and control [enrolled] judgment[s]"). Therefore, the circuit courts acted without authority when they vacated the enrolled paternity judgments and the Court of Special Appeals similarly erred when it affirmed the circuit court's decision to vacate the judgment in case no. 157.

*AS TO CASE NUMBER 144: JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REINSTATE THE 1990 PATERNITY JUDGMENT. COSTS TO BE PAID BY RESPONDENT.*

*AS TO CASE NUMBER 157: JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY TO REINSTATE THE 1986 PATERNI-*

*TY JUDGMENT. COSTS IN THE COURT OF SPECIAL APPEALS AND IN THIS COURT TO BE PAID BY RESPONDENT.*

ELDRIDGE, Judge, dissenting.

The majority decides that the judgment in a paternity case may not be vacated absent a showing of "fraud, mistake, or irregularity," under the narrow definition of those terms set forth in Maryland case law, even though scientific evidence is later obtained which conclusively establishes that an "adjudged father" is not in fact the biological father of the child.[1] Although I would agree that a judgment ordinarily should not be set aside unless the strict requirements of Maryland Rule 2–535(b) have been met, a paternity action differs significantly from other adjudications and merits different treatment.

As the Court of Special Appeals pointed out in Case No. 157, the unique nature of paternity actions, and the need for some flexibility in such actions, was recognized by the General Assembly in the paternity statute. Maryland Code (1984, 1991 Repl.Vol.), § 5–1007 of the Family Law Article, provides that "[a]ny rule of court or statute that relates to procedure applies to a proceeding under this subtitle only to the extent that the rule or statute is ... (1) practical under the circumstances...." This statutory provision furnished ample authority for the circuit courts' decisions in both cases. I would affirm.[2]

---

**1.** In Case No. 144, the scientific evidence consisted of the blood tests ordered by the circuit court nearly two and one-half years after the paternity adjudication. The results of these tests excluded Tyrone as a potential father.

In Case No. 157, Vandella H., the mother of the child whose paternity was at issue, testified that she last had sexual relations with John S., the child's adjudged father, approximately one year before her child was born. It is, I believe, scientifically well-established that human beings have a nine-month, not a twelve-month, period of gestation.

**2.** Although the issue was not raised by any party, I also question the standing of the Attorney General of Maryland to file petitions for writs of certiorari in these two cases. The Attorney General's lack of standing is a matter which this Court may appropriately notice *sua sponte,*

In a paternity action, unlike other lawsuits, a court is called upon to declare a scientific, biological fact, namely whether a particular individual is the biological father of a given child. Most other types of lawsuits, however, require a court to decide upon the appropriate *remedy* in a particular situation based upon society's rules applicable to human conduct. While the judgments in ordinary lawsuits often depend upon the judicial system's ascertainment of historical facts, the typical judicial fact-finding process is quite different from what a court is asked to do in a paternity action.

Moreover, the scientific processes for determining fatherhood have been rapidly improving. In addition to the red blood cell antigen test (RBC), "the first level of genetic systems tested," there are available tests such as the human leukocyte antigens system (HLA) and the red cell enzymes and serum proteins which may be used to produce a high rate of exclusion. United States Department of Health and Human Services, *Paternity Establishment*, at 61 (3d ed. 1990). The "HLA has a very high probability of exclusion (95%), which can be increased to approximately 99% when combined with other tests for red cell antigens and enzymes, and plasma protein systems." Sidney B. Schatkin, *Disputed Paternity Proceedings*, § 11.04, at 11–48 (4th ed. 1976). In addition, DNA testing can provide even more reliable information "since no two people, aside from identical twins, have the same genetic composition." *Id.* § 11B.01 at 11B–3. " '[D]isputing [DNA] technology is like disputing the law of gravity' ". *Id.* § 11B.01 at 11B–41. *See also* Debra Cassens Moss, *DNA— The New Fingerprints*, A.B.A.J. 66 (May 1, 1988) ("In the family law area, [DNA testing] means a woman suing for paternity can establish conclusively whether the respondent is the father"). It is absurd, in the face of incontrovertible scientific evidence, for a court to treat as binding, for the future, a patently erroneous declaration of biological fact.

---

and which should result in a dismissal of certiorari. *See County Council v. Md. Reclamation,* 328 Md. 229, 614 A.2d 78 (1992).

A judgment of paternity has continuing ramifications uncharacteristic of the typical judgment rendered by a court. In addition to providing the basis for child support, a paternity determination affects, *inter alia,* inheritance rights, citizenship, and the child's knowledge of his or her medical history. *See Locklear v. Sampson,* 478 So.2d 1113, 1115 (Fla.App.1985); *Crowder v. Com. Ex. Rel. Gregory,* 745 S.W.2d 149, 151 (Ky.Ct.App.1988). Thus, accurate determinations of paternity are critical, not simply because a child is entitled to financial support from his or her father, but also because a child may later be in need of a blood transfusion or an organ transplant from a compatible family member. A child may face decisions about marriage and childbearing based on the risk of passing on what the child believes are inherited conditions.

Similar ramifications are not usually associated with ordinary tort or contract litigation. In an automobile injury case, for example, a factfinder might decide that the traffic light was green when the plaintiff's car entered the intersection. If later it were irrefutably established that the light had been red, the consequences of foreclosing the matter because of the earlier judgment, which would simply involve the effect on the parties of the award or non-award of damages, are less compelling than the consequences of a paternity declaration.

Incidental to the resolution of the dispute between the mother and the putative father, a paternity judgment affects the interests of third parties to a greater extent than other judgments. A child has an independent interest in receiving financial support from his or her true parents. Furthermore, a child has an interest in knowing his or her true heritage for medical and psychological reasons, inheritance, and other purposes. Likewise, the natural father is entitled to an accurate determination of paternity, not just in order to uphold his parental obligations, but also for psychological and emotional reasons.

As previously mentioned, the General Assembly in the paternity statute itself recognized the unique nature of paternity actions and the need for flexibility in applying procedural

rules to paternity actions. Section 5–1007 of the Family Law Article provides as follows:

### "§ 5–1007. Inconsistent statutes or rules.

Any rule of court or statute that relates to procedure applies to a proceeding under this subtitle only to the extent that the rule or statute is:

(1) practical under the circumstances; and

(2) not inconsistent with this subtitle."

Maryland Rule 2–535(b) is plainly a procedural rule which should be relaxed upon the type of showing that was made in these cases. Under the circumstances, it is not "practical" to apply Rule 2–535(b). Consequently, as the Court of Special Appeals held, § 5–1007 plainly authorized the decisions of the circuit courts in these two cases.

The majority opinion's answer to the Court of Special Appeals' reliance on § 5–1007 is simply to say that "[a] harsh result or an unfair decision is not equivalent to impracticality." No explanation or reasoning is offered in support of the majority's ipse dixit. It is reasonable to assume that harsh or unfair results, because of a rigid application of procedural rules, is exactly what the Legislature had in mind when it enacted § 5–1007. Moreover, it would certainly seem that requiring continuing adherence, by all persons, to an erroneous declaration of an objectively ascertainable scientific fact, is not "practical."

The majority opinion also relies on § 5–1038(b) of the Family Law Article. The entire § 5–1038, however, provides as follows:

### "§ 5–1038. Finality; modification.

(a) *Declaration of paternity final.*—Except in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity, a declaration of paternity in an order is final.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside

any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child."

While today there are no separate "equity court[s]" and Rule 2–535(b) ordinarily applies to all actions in the same manner, the Legislature's specific reference to "equity" in § 5–1038 indicates an intent that declarations of paternity be subject to revision based on equitable principles. The Court of Special Appeals in Case No. 157 pointed out that

"§ 5–1038(a) expands the revisory powers set forth in Rule '2–535 . . . by allowing modification of a paternity decree to the extent that the decree is subject to established equity principles.

" 'It is a well established principle that courts of equity will not permit the forms of law to be made the instruments of injustice, but will interpose against parties attempting to avail themselves of the rigid rules of law for unfair purposes.' *Hyatt v. Romero,* 190 Md. 500, 505 [58 A.2d 899] (1948). Appellants' assertion, that the limitations set forth in Rule 2–535 . . . preclude the modification of the decree, permits the forms of law to triumph over equity. To compel a person, who is not the father of a child, to continue paying support for that child when the child's mother, the child's biological father, and the alleged father agree on the issue of paternity, and the child's birth certificate and name have been changed to reflect his true parentage, perpetuates injustice and defines common sense."

In light of the basic differences between paternity judgments and the judgments in other types of lawsuits, the majority's holding today, in the words of the Court of Special Appeals, "defies common sense." Undoubtedly society has a strong interest in ending disputes at some point in time, and normally other interests must yield to the limitations on a court's revisory powers. Nevertheless, a completely rigid adherence to the shibboleth that "in today's highly litigious society, there must be some point in time when a judgment becomes final," in the face of irrefutable scientific evidence

that a particular individual did not father a given child, with all of the attendant ramifications of such decree, is absurd. Under the majority's view, presumably if the Provincial Court of Maryland in the 1600's had issued a decree that the earth was flat, the absence of "fraud, mistake or irregularity," as narrowly defined by this Court, would make that Provincial Court decree sacrosanct. Or, if Rule 2–535(b) were to be given extra-territorial effect, presumably the March 5, 1616, decree by a tribunal in Rome, aimed at Galileo Galilei, and declaring that Copernicanism is erroneous and that the planet earth is the center of the universe, would be given conclusive effect. Like the courts below, I do not believe that all common sense must be abandoned in the name of Rule 2–535(b).

Judge RAKER has authorized me to state that she concurs with the views expressed herein.