788 A.2d 609

Nicholas Todd WALTER

v.

Michele GUNTER.

No. 41, Sept.Term, 2001.

Court of Appeals of Maryland.

Jan. 9, 2002.

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Joseph B. Spillman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

The decisional issue in this case is whether the appellant, Nicholas Todd Walter, remains liable for child support arrearages when the paternity judgment, from which the child support order emanates, was vacated. We hold that the putative father cannot be legally obligated for child support arrearages that result from a now-vacated paternity judgment. The trial court is without discretion in this matter because, as a matter of law, the inherently dependent child support orders are invalid upon the vacatur of the paternity declaration.

## I. Background

On August 13, 1993, the appellee, Michele Gunter, filed a Complaint to Establish Paternity in which she claimed that Nicholas Todd Walter was the father of her child. Walter consented to a judgment of paternity on September 30, 1993, based on Gunter's representations that she had not had sexual relations with any other man during the period of conception. Pursuant to the court's paternity judgment, Walter was ordered to pay child support in the amount of $43.00 per week.

During the following years, periodic civil contempt proceedings were brought against Walter to enforce the child support obligation. Walter's financial stresses stemmed, at least to some degree, from an injury sustained in a work related accident in 1996 that was exacerbated by a subsequent motor

vehicle accident making him unable to work in his prior job.[1] For these reasons, on March 30, 2000, Walter filed a petition to modify child support. Walter contemporaneously filed a motion for genetic testing. Walter asserted that Gunter's family members had told Walter repeatedly that he was not the child's father and that he wanted a paternity test to prove that the child was indeed his. The genetic testing, however, *excluded Walter conclusively* as the father of the child. As a result, the Circuit Court for Anne Arundel County, on September 28, 2000, terminated Walter's prospective child support obligation, subject to further argument on retroactivity.

On October 19, 2000, a hearing before a Master was conducted to determine whether Walter would remain responsible for paying the arrearages and whether he could recoup the child support payments already made. The Master recommended that the circuit court set aside the paternity judgment, deny Walter's request for recoupment of child support previously paid, deny Walter's request that he not be responsible for arrearage, and order Walter accountable for the accrued arrearage as of March 30, 2000, the date on which he filed his motion for genetic testing.

Walter filed exceptions to the Master's recommendations based solely on the arrearage issue.[2] A hearing on the

---

1. It appears that Walter was employed by four different employers throughout his "paternal" years, but that his occupation involved operating motor vehicles, i.e. tow trucks or cabs. At the time Walter petitioned to modify child support he indicated that he could no longer work as a cab driver due to the severity of his injuries.

2. Walter filed his exceptions and requested a hearing on December 14, 2000. The circuit court proceeded without a hearing and issued its order on December 20, 2000. As a result, Walter filed a Motion to Strike the Order and requested, again, a hearing on the exceptions. The motion was granted, the Order stricken, and the hearing scheduled for March 9, 2001.

We note that Walter did not file an exception to the Master's recommendation regarding the issue of recoupment of the child support already paid. The Master stated that Walter had no automatic right to recoupment, but instead, that recoupment was within the sound discretion of the court upon consideration of the best interests of the child. Therefore, believing that recoupment would be detrimental to the best

exceptions was held on March 9, 2001 before the Circuit Court for Anne Arundel County, and the exceptions were overruled. The circuit court, accepting the Master's recommendations, set aside the paternity judgment and ordered that Walter was responsible for the arrearage in existence as of March 30, 2000, totaling $11,228 (of which $4,153.33 was owed to the State Department of Social Services).[3]

Mr. Walter appealed to the Court of Special Appeals and filed in this Court a petition for certiorari before judgment and a petition for expedited review. We granted certiorari to determine whether the appellant, Nicholas Todd Walter, remains liable for child support arrearages when the paternity judgment, from which the child support order emanates, was vacated, and whether, in the event that we hold Walter liable for the arrearages, he may be subject to contempt proceedings or imprisonment for failure to make payments on the arrearage. *Walter v. Gunter,* 364 Md. 534, 774 A.2d 408 (2001). Because we hold that Walter cannot be legally obligated for child support arrearages that result from a now-vacated paternity judgment, we do not reach the second issue.

## II. Standard of Review

■ Review by this Court involves interpreting whether the circuit court's order was legally correct. While child support orders are generally within the sound discretion of the trial court, *see Beckman v. Boggs,* 337 Md. 688, 703, 655 A.2d 901, 908 (1995)(discussing the circuit court's discretion in family matters, with specific reference to visitation orders); *Giffin v. Crane,* 351 Md. 133, 144, 716 A.2d 1029, 1035 (1998)(reviewing the lower court's determination of custody); *Early v. Early,*

---

interests of the child, the Master recommended that the circuit court deny Walter's request for recoupment. Walter did not except to this recommendation and the circuit court ultimately adopted the Master's recommendation and denied Walter's claim for recoupment. The recoupment issue is not presently before this Court.

3. Walter was in arrears of $12,303 as of the date that the paternity judgment was set aside. The Circuit Court Order, however, provided that Walter was responsible for the arrearage as of the date of filing the motion for genetic testing (March 30, 2000).

338 Md. 639, 654, 659 A.2d 1334, 1341 (1995)(reviewing the circuit court's child support order), not to be disturbed unless there has been a clear abuse of discretion, where the order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are "legally correct" under a *de novo* standard of review. *See In re Mark M.*, 362 Md. 623, 766 A.2d 147 (2001)(reviewing a trial court's visitation order *de novo* when the issue involved whether the order itself constituted an improper delegation of judicial authority).

## III. Discussion

█ The issue we decide today—whether a child support order, terminated [4] by the circuit court prospectively after the vacatur of the paternity declaration, may still oblige the father to satisfy arrearage-is a novel question of law. As is often the case with novel legal questions, a comprehensive understanding of the issue necessitates consideration of several facets of the pertinent law. The matters we consider today are tailored by the arguments proffered by the parties and the law on which the Master and the circuit court relied in declaring Walter responsible for the arrearage. The parties argue that specific provisions of the Family Law Article, namely Section 12–104 [5] and Section 5–1038(b),[6] either prohibit or require this

---

4. We note that use of the word "terminate" with respect to support orders may have different legal consequences than the use of the word "vacate." As such, we believe it to be better practice to *vacate* the child support order simultaneously with vacating the paternity declaration.

5. Maryland Code (1984, 1999 Repl.Vol.), Section 12–104 of the Family Law Article provides for modification of a child support award as follows:
 (a) *Prerequisites.*—The court may modify a child support award subsequent to the filing of a motion for modification and upon a showing of a material change of circumstance.
 (b) *Retroactivity of modification.*—The court may not retroactively modify a child support award prior to the date of the filing of the motion for modification.

6. Further references to Section 5–1038 are specifically to Maryland Code (1984, 1999 Repl.Vol.), § 5–1038 of the Family Law Article, unless otherwise noted. Section 5–1038 provides:

Court to find in their favor. The parties, as well as the Master and the circuit court, also rely extensively on dicta in this Court's recent decision, *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000), to support their respective arguments. We will briefly address the proper application of each of these statutory sections in the Family Law Article and the application of our decision in *Langston, supra,* as such review will not only provide guidance for future proceedings of this nature, but will help to narrow the issue before us.

■ First, the facts of this case do not present a situation encompassed by Section 12–104 of the Family Law Article, which confines a court's ability to modify a child support order subsequent to the date of the filing of a motion for modification. In the case *sub judice*, this Court must consider the *viability* of a child support order *after the very paternity declaration, from which the child support order originates, has been vacated,* not the modification of a child support order requested as a result of some material change of circumstance

---

(a) *Declaration of paternity final; modifications.—*

(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

(2) (i) A declaration of paternity may be modified or set aside:

1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or

2. if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

(b) *Other orders subject to modification.—*Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child. The obvious distinction between these two sections is that part (a) applies to paternity declarations while part (b) applies to the other related paternity orders that are often borne from a paternity declaration. *See infra* note 7 (discussing the orders subject to Section 5–1038(b)).

of one of the parties before the court. Therefore, Section 12–104 does not limit our review of the issue presently before us.

▪ Second, the facts of this case do not permit consideration of the discretionary authority afforded courts by Section 5–1038(b), which provides:

> Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

Md.Code, § 5–1038(b) of the Family Law Article. We have clearly stated, on several occasions, that Section 5–1038(b) operates to ensure continuing jurisdiction for paternity orders (with the exception of paternity declarations) for purposes of modifying or vacating those orders as may be "just and proper in light of the circumstances and in the best interests of the child." *Id.; See also, Jessica G. v. Hector M.,* 337 Md. 388, 401, 653 A.2d 922, 928–29 (1995); *Adams v. Mallory,* 308 Md. 453, 463, 520 A.2d 371, 376 (1987). Yet, the orders subject to this provision are those articulated throughout the paternity proceeding subtitle, and therefore, *necessarily stem from a paternity declaration.*[7] *See* Md.Code, § 5–1038(b)(explicitly

---

7. Paternity orders subject to Section 5–1038(b) include: the medical support of the child pursuant to Section 5–1033(a), the attorneys fees of the complainant pursuant to Section 5–1033(c)(2), and visitation privileges or custody pursuant to Section 5–1035(a). *See Jessica G.,* 337 Md. at 401, 653 A.2d at 929 (stating that "the 'orders' to which FL § 5–1038(b) are applicable would seem to be all inclusive"); *Adams,* 308 Md. at 463, 520 A.2d at 376 (listing several orders addressed by Section 5–1038(b) and including the catch-all, "any other matter that is related to the general welfare and best interests of the child" pursuant to Section 5–1035(a)(4)).

We have also opined that child support orders should be subject to discretionary review by the trial court pursuant to Section 5–1038(b). *See Markov v. Markov,* 360 Md. 296, 312–13, 758 A.2d 75, 84 (2000), but *Markov* did not specifically consider whether one should remain responsible for arrearages upon proper vacatur of a paternity declaration. While paternity in *Markov* was contested, the case arose from a divorce proceeding and involved the issue of whether the putative father was equitably estopped from denying a duty to pay support. *Id.* at 298, 758 A.2d at 76. We discussed Section 5–1038(b) in dicta and only in relation to a possible challenge that the twin girls might raise against

encompassing "any order or part of order under this subtitle"—"this subtitle" refers to subtitle 10 which consists of paternity proceedings provisions). In the absence of a paternity declaration, these orders have no foundation and the aforementioned "continuing jurisdiction" is meaningless.

 This case presents a factually unique circumstance: the circuit court terminated ongoing child support, yet ruled that the arrearage, which resulted from the very same child support order, still obligated the now non-paternal "father." Ostensibly, the circuit court used its discretionary authority to "modify" a child support order as is "just and proper in light of the circumstances." Md.Code, § 5–1308(b). Contrary to the parties' assertions, this is not a situation that can be readily discharged under Section 5–1038(b). In fact, Section 5–1038(b) is inapplicable. Section 5–1038(b) deals strictly with paternity orders, i.e. orders relating to or arising from paternity declarations, or more specifically, orders relating to *valid and enforceable* paternity declarations. The absence of a paternity declaration, as becomes its status upon vacatur,[8] demands the abrogation of a court's *discretion* to "modify or set aside" a child support order relating to that paternity declaration.

 The utility of Section 5–1038(b) is that it grants courts discretionary authority to modify paternity orders when a *valid* paternity declaration is in place. A court has no discretion, however, to "modify" a child support order which is based on a vacated paternity judgment because the order itself is inextricably linked to the paternity declaration, its viability, absolutely dependent on the viability of the paternity declaration.

---

the putative father should the court deny child support entirely. *Id.* at 312–13, 758 A.2d at 84.

**8.** Vacatur is a "[t]he act of annulling or setting aside. A rule or order by which a proceeding is vacated." Black's Law Dictionary 1388 (5th ed. 1979). To vacate is "[t]o render an act void; as, to vacate an entry of record, or a judgment." *Id.* Clearly upon vacating a paternity declaration, it no longer exists or has legal force.

That the child support order is contingent upon an initial paternity declaration is evidenced by Section 5–1032 of the Family Law Article, which provides that upon a finding that the alleged father is the paternal father, the court must issue an *order which both declares paternity and provides for support of the child. See* Md.Code (1984, 1999 Repl.Vol.), § 5–1032(a) of the Family Law Article. Furthermore, the very basis for child support, and an articulated purpose of the paternity proceedings article, is *"to impose on the mothers and fathers of children* born out of wedlock the basic obligations and responsibilities of parenthood." *See* Md.Code, (1984, 1999 Repl.Vol.) § 5–1002(b)(2) of the Family Law Article (emphasis added).

██ "[P]arenthood is both a biological and a legal status, that by nature and law it confers rights and imposes duties, and that one of the duties it casts upon parents is the duty to support their children...." *Thrower v. State ex. rel. Bureau of Support Enforcement,* 358 Md. 146, 159, 747 A.2d 634, 641 (2000)(discussing *Carroll County v. Edelmann,* 320 Md. 150, 577 A.2d 14 (1990)). Without question, the biological and legal status of "parenthood" in Walter's situation is now extinct; the genetic test extinguishes the prior, and the vacatur of the paternity declaration extinguishes the latter. In the absence of "parenthood" status, the duty that is normally cast upon parents, e.g. the duty of child support, can no longer exist.[9] To conclude otherwise would erroneously permit courts to financially obligate a person to a judgment while completely lacking the statutory (or equitable) authority to so obligate.

██ Without paternity, there is no legal duty; without a legal duty, there can be no financial obligation. *See Bledsoe v. Bledsoe,* 294 Md. 183, 193, 448 A.2d 353, 358 (1982)(stating

---

9. If this Court can hold, as it has, that the duty of child support does not extend to a stepparent, *see Knill v. Knill,* 306 Md. 527, 531, 510 A.2d 546, 548 (reiterating that "[t]he duty of child support extends to the natural parents of an illegitimate child, but not to a stepparent"), then certainly the duty of child support should not extend to a person not related by either blood or marriage.

that "the legal obligation to support children arises out of parenthood"); *Brown v. Brown,* 287 Md. 273, 284, 412 A.2d 396, 402 (1980)(defining a "child" or "children" of specific individuals as "immediate offspring")(quoting *Billingsley v. Bradley,* 166 Md. 412, 419, 171 A. 351, 354 (1934)). Nowhere in the Family Law Article does it state that a man, conclusively found not to be the paternal father, retains the same responsibilities of a man declared to be the paternal father; [10] *see Knill v. Knill,* 306 Md. 527, 531, 510 A.2d 546, 548 (1986) (describing Maryland's long history of "plac[ing] the responsibility of child support squarely upon the shoulders of the *natural parents*")(emphasis added); *Brown,* 287 Md. at 284, 412 A.2d at 402 (stating that "the duty of parents to provide for the maintenance of their children, is a principle of natural law; an obligation laid on them not only by nature herself, but by their own proper act, in bringing them into the world")(quoting 1 W. Blackstone, Commentaries on the Laws of England 447 (1854)); nor does there seem to be any situation in law, contract, tort, or otherwise, that would require a continuing financial obligation on a contract subsequently ruled invalid or a tort judgment subsequently vacated, even if, during the period for which the contract or judgment remained valid, the person so obligated accrued debt or arrearages. We refuse to create that situation here.

The Consent Order embodying the paternity proceedings for this case is emblematic of the dependency of a child support order on the paternity declaration. The Consent Order provided in relevant part:

> Upon the consent of the parties, it is hereby ORDERED this 3rd day of September, 1993:

---

**10.** We recognize that contract or equitable estoppel principles might prevent a man who has held himself out to be the father of the child(ren) from denying a support obligation. *See Markov v. Markov,* 360 Md. 296, 307, 758 A.2d 75, 81 (2000); *Knill v. Knill,* 306 Md. 527, 536, 510 A.2d 546, 551 (1986); *Bledsoe,* 294 Md. at 193, 448 A.2d at 359; *Brown,* 287 Md. at 284, 412 A.2d at 402. Nevertheless, as these cases make clear, there are major differences between a contractual legal obligation to support and the legal non-contractual obligation to support.

A. That the Defendant [Walter] is the father of the minor child(ren), Taylor Alexandria Gunter, born, 9/3/92.

B. That the Defendant [Walter] is charged with support of the minor child(ren) named above until such child(ren) shall become 18 years of age, die, marry, or become self-supporting, whichever event first occurs.

C. That the Defendant [Walter] shall pay the sum of $43.00 Dollars per week, pursuant to the Maryland Child Support Guidelines, accounting from the 5th day of October, 1993, for the temporary support and maintenance of the minor child(ren).

\* \* \* \* \* \* \* \*

As is indicated by the Consent Order, and as is required by Section 5–1032, the circuit court first declared Walter to be the father of the child *and then* assigned Walter a duty of financial support. Conceptually, it is difficult to reconcile the argument that the portion of the Consent Order on which all other portions rely could be vacated, while the order to pay child support remains in effect, at least to the extent that Walter has been ordered to pay the arrearage. By vacating a child support order, it is not simply prospective relief that is realized; rather, at least any and every outstanding inchoate legal obligation is also invalidated.[11]

This Court historically has recognized a distinction between a standard debt and a legal duty in domestic circumstances, specifically with respect to child support, and subscribes to the theory that child support is a duty not a debt. *See Middleton v. Middleton,* 329 Md. 627, 629–33, 620 A.2d 1363, 1364–66 (1993)(discussing the development of the debt/duty distinction with respect to domestic financial support obligations). Child support is a "legal duty arising from or imposed by law." *Id.* at 633, 620 A.2d at 1366 (citations and quotations omitted). The duty/debt distinction, however, does not alter the effect of a vacated paternity judgment. To the contrary, a vacated

---

**11.** Again, we note that the issue of recoupment is not before this Court; our holding today is strictly limited to the issue of child support arrearage. *See supra* note 2.

paternity judgment effectively extinguishes that "legal duty arising from or imposed by law," and as that duty is extinguished, so too is the financial obligation attached to that duty. When non-parents are forced to bear the financial burden of erroneous paternity declarations, the State risks losing credibility when seeking to enforce the true and authentic parental duty and its related financial obligations on behalf of the children of this State.[12]

We cannot dispense this ruling without a brief discussion of our decision in *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000), as it is the primary case on which the Master and the circuit court rely and to which the parties have looked for guidance in presenting their arguments before us.

The issues in *Langston* were whether Section 5–1038, which allows courts to set aside paternity judgments upon discovery by blood or genetic testing that the adjudged father is excluded as the actual biological father, could be retroactively applied to paternity declarations issued prior to the October 1,

---

12. We pause to comment on the concerns articulated by Judge Wilner in his dissent. Certainly a father who waits 7 years to contest paternity is no shining example of how we would wish the paternity decisions in this State to be made. As troubling as the lapse of time may be, this Court cannot judicially "correct" these outcomes by holding a man who is not the father of the child liable for a child support order which was both entered erroneously and subsequently vacated. Judge Wilner's concerns would be better addressed by mandates from our Legislature which, for example, might establish either: (a) a statute of limitations for contesting paternity; (b) a statute limiting the effect of vacated paternity judgments, i.e. requiring fathers to pay to the date of vacatur; or (c) state-provided paternity testing prior to entry of a paternity declaration. It is legislative action, not judicial decree, which would properly ease Judge Wilner's concerns.

Judge Wilner further likens our decision to an "assault ... on the efforts to assure the decent support of children." Again, we note that the very basis for child support, and an articulated purpose of the paternity proceedings article, is *"to impose on the mothers and fathers of children* born out of wedlock the basic obligations and responsibilities of parenthood." *See* Md.Code, (1984, 1999 Repl.Vol.) § 5–1002(b)(2) of the Family Law Article (emphasis added). Our Legislature never stated that the "decent support of children" should be imposed upon those who are found, conclusively, *not* to be the child's parent; and should they so intend, such obligation must be explicitly enacted by our representatives in the Legislature, not created by judicial edict.

1995, the effective date of the law, and whether and to what extent the trial court must consider the "best interests of the child" prior to ruling on the reconsideration of paternity. *Id.* at 403, 754 A.2d at 392. Upon review of the legislative history of Section 5–1038, we held that Section 5–1038(a) applied to paternity declarations issued prior to October 1, 1995 and that the best interests of the child, pursuant to Section 5–1038(b), had no bearing on the paternity declaration itself. *Id.* at 403, 427–28, 754 A.2d at 392, 406.

As we noted in *Langston,* the Legislature altered Section 5–1038(a) to overturn the effect of our decision in *Tandra S. v. Tyrone W.,* 336 Md. 303, 648 A.2d 439 (1994), which precluded putative fathers from requesting vacatur of paternity judgments in the absence of evidence of "fraud, mistake, or irregularity."[13] *Langston,* 359 Md. at 405, 754 A.2d at 393.

---

**13.** At the time *Tandra S.* was decided, Section 5–1038 only permitted review of paternity declarations pursuant to a court's revisory powers. The section provided:

(a) *Declaration of paternity final.*—Except in the manner and to the extent that any order or decree of an equity court is *subject to the revisory power of the court* under any law, rule, or established principle of practice and procedure in equity, a declaration of paternity in an order is final.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

*See* Maryland Code (1984, 1991 Repl.Vol.), § 5–1038 of the Family Law Article (emphasis added). The Maryland courts' revisory power is provided in Maryland Rule 2–535:

(a) Generally.—On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534.

(b) Fraud, Mistake, Irregularity.—On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity.

(c) Newly Discovered Evidence.—On motion of any party filed within 30 days after entry of judgment, the court may grant a new trial on the ground of newly-discovered evidence that could not have been discovered by due diligence in time to move for a new trial pursuant to Rule 2–533.

(d) Clerical Mistakes.—Clerical mistakes in judgments, orders, or other parts of the record may be corrected by the court at any time

The principle extended in *Langston* was that genetic testing, under Section 5–1038(a), was available to any putative father who sought to challenge a paternity declaration entered against him without the benefit of blood or genetic test evidence. *Id.* at 427–28, 754 A.2d at 406. Simply put, the *Langston* holding applied only to paternity proceedings under Section 5–1038(a); it did not consider whether orders other than paternity declarations, such as child support orders, which are borne from an original paternity declaration, could be set aside pursuant to Section 5–1038(b) upon the vacatur of the original paternity declaration. *Id.* at 437, 754 A.2d at 411.

The Master, the circuit court, and the parties to this case have focused almost exclusively on two portions of the *Langston* opinion in support of their respective arguments and/or conclusions. We provide the first portion below:

> Our holding does not apply to the support already paid by putative fathers and to the arrears they owe in support. Those property rights are already accrued. It would clearly raise problems, particularly in the areas of takings and due process, for this Court to interpret the statute to extend the retroactive application of Chapter 248 so far that a child must pay back support already claimed, adjudicated, received, and expended through a paternity-related child support, or other compensatory order, during the period it was legally in effect. Likewise, this reasoning applies to any debt owed by a putative father through the prior support or compensatory order, which is enforceable at least until the putative father initiates proceedings to attack the paternity declaration to which the order relates.

*Id.* at 423, 754 A.2d at 403. Too much weight, albeit understandably, has been placed on this portion of the opinion. Notwithstanding that this language was clearly dicta, its sole utility was to limit our holding in the specific case to paternity

---

on its own initiative, or on motion of any party after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed by the appellate court, and thereafter with leave of the appellate court.

declarations under Section 5–1038(a). We did not wish to convey that our retroactive application of Section 5–1038(a) could be interpreted to include, solely by virtue of our decision in *Langston,* orders that were normally subject to Section 5–1038(b), particularly in view of the delicate nature of retrospective application of a statute. *See Rawlings v. Rawlings,* 362 Md. 535, 555–56, 766 A.2d 98, 109 (2001); *Roth v. Dimensions Health Corp.* 332 Md. 627, 636, 632 A.2d 1170, 1174 (1993); *Washington Suburban Sanitary Comm'n v. Riverdale Heights Fire Co.,* 308 Md. 556, 568, 520 A.2d 1319, 1325 (1987).

Our intention in this regard also was articulated by the second portion of *Langston* on which the Master, circuit court and parties heavily rely:

*Our holding today applies only to proceedings to modify or set aside a paternity declaration;* an attempt to modify or set aside any other order resulting from an original paternity declaration is governed by section 5–1038(b). In addition, the holding of this Court does not necessarily affect any child support already paid or in arrears as of the date of the filing of these respective proceedings at the trial court.

*Id.* at 437, 754 A.2d at 411 (emphasis added). Again, the function of this language was to limit our holding to paternity challenges under part(a) of Section 5–1038. Our reference to Section 5–1038(b) iterated the constraints of our holding by explaining that other orders resulting from paternity declarations were not impacted by our retroactive application of Section 5–1038(a) with respect to disputed paternity declarations. As our holding today clarifies, however, once a paternity declaration supporting arrearage is vacated, the child support order resulting from the paternity declaration is also invalid, and cannot be subject to the discretionary power of the courts pursuant to Section 5–1038(b). We reiterate that the outcome at which we arrive today is not the result of a retroactive application of the statute,[14] but rather, a nullifica-

---

14. In such a circumstance, it is true, we would be required to consider whether retroactive application interfered with vested or substantive rights. *See Rawlings,* 362 Md. at 555, 766 A.2d at 109; *Waters Landing*

tion of the child support order. As such, the *Langston* decision, while pertaining to closely related paternity matters, is distinct from the issues presented today.

In conclusion, we hold that upon vacating a paternity declaration, the putative father cannot be legally obligated for arrearages emanating from child support orders resulting from the now-vacated paternity declaration. The trial court is without discretion in this matter because, as a matter of law, the dependent paternity orders are invalid once the paternity declaration is vacated.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.*

Concurring opinion by BELL, C.J.

Dissenting opinion by WILNER, J.

Dissenting opinion by HARRELL, J., joined by RAKER, J.

BELL, Chief Judge, concurring.

In *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000), this Court, in a four to three decision, held that Md.Code (1984, 1999 Repl. Vol.), § 5–1038(a) of the Family Law Article was enacted by the Legislature

> "to be applied to all paternity cases, whenever initiated. Thus, anyone who has a paternity declaration entered against him prior to October 1, 1995, without blood and genetic testing, generally may initiate proceedings to modify or set aside that declaration under section 5–1038(a)(2)(i)2 of the Family Law Article. In those proceedings, the putative father may, by motion, request a blood or genetic test, pursuant to section 5–1029, in order to confirm or deny paternity, which is admissible in evidence under the provi-

*Ltd. Partnership v. Montgomery County,* 337 Md. 15, 29, 650 A.2d 712, 718 (1994).

sions of that statute. A determination of the best interests of the child in ordering the requested testing, or in the consideration of paternity, whether original or revised, is inappropriate. Our holding today applies only to proceedings to modify or set aside a paternity declaration; an attempt to modify or set aside any other order resulting from an original paternity declaration is governed by section 5-1038(b)."

359 Md. at 437, 754 A.2d at 411. I was one of the dissenters, registering my views "as forcefully as possible." *Id.* at 459, 754 A.2d at 423. Today, we hold, and again it is a sharply divided Court, again a four-three margin, that a man who consented to a judgment of paternity, without taking a blood test, is not liable as a matter of law, for the child support arrearages accrued on that judgment once a blood test, obtained in accordance with the *Riffe* interpretation of § 5-1038(a), excluded him as the father of the child whose paternity he had admitted and, as a result of which, that judgment has been vacated. In this case, I join the majority and, indeed, provide the margin. Because the result in this case is a consequence of the decision in *Riffe*, in which I was so vociferous in my disagreement with the majority in that case, I write separately to explain my vote and its consistency.

Although a four to three decision on the bottom line, there were six judges who subscribed to the interpretation of § 5-1038(a)(2) set out in the majority opinion in *Riffe*. Two of the dissenters took the position that the section simply applied prospectively only. *See* 359 Md. at 460, 754 A.2d at 423 (Wilner, J. dissenting). Five judges, including me, *see* 359 Md. at 438, n. 1, 754 A.2d at 412 n. 1 (Bell, C.J. dissenting), believed that the intent of the Legislature was to have the statutory amendment, whether interpreted as I suggested or as the eventual majority espoused, apply retrospectively, not just to future cases. Although the majority engaged in a detailed and painstaking analysis of the retrospectivity issue, I did not join that debate, noting simply and concisely what I believed, and still believe, motivated the Legislature's action and, thus, informed its intent with respect to others similarly

situated: "I agree that the Legislature intended the amendment to be retroactive. Having acted with the dispatch that it did, it is inconceivable that it would intend that any meritorious case would be left without a remedy." *Id.* Like the majority, I was convinced by the circumstances and the reasons given for the legislation that the Legislature was intent on avoiding a repetition of the situation that was presented in, or the perception that was generated by, *Tandra S. v. Tyrone W.*, 336 Md. 303, 648 A.2d 439 (1994), the case that the legislation was designed to, and did, overrule.

In *Tandra S.*, we held that the rule of finality was sacrosanct, prevailing over a blood test that excluded the putative father and the mother's admission that the putative father was not the child's father by changing the child's name shortly after the paternity decree had been issued to that of a man, whom she identified as the child's father, 336 Md. at 322–23, 648 A.2d at 448, and without regard to whether the adjudicated fathers acted in good faith or with ordinary diligence. Thus, the petitioners, who were excluded as fathers were not entitled to modification of the paternity judgments because the blood test results, however accurate scientifically,[1] and the admission of the mother[2] did not establish fraud, mistake or

---

1. As to the blood tests, we stated:
 "The blood tests, which the circuit court relied on in vacating the judgment, do not alter this result. Rule 2–535(b) provides a circuit court with very limited revisory powers. The results of the blood test did not change the unambiguous mandate that exists in the revisory rule. Therefore, the circuit court erred when it vacated the 1990 paternity judgment and left the child fatherless because, as the circuit court itself recognized, neither fraud, mistake, nor irregularity had occurred. The majority of decisions from other jurisdictions similarly reject attempts to reopen paternity judgments based on post-judgment blood tests."
 *Tandra S. v. Tyrone W.*, 336 Md. 303, 320, 648 A.2d 439, 447 (1994).

2. As to the admission by changing the child's name, the Court said:
 "But this did not have the effect of nullifying the 1986 paternity judgment, which declared John to be the father; furthermore, it did not vest paternity in Randy. In regard to paternity and as to the parental relationship between John and the child, the name change was meaningless. See *Carroll County v. Edelmann*, 320 Md. 150,

irregularity. It was to this rigidity, characterized as lacking common sense, and perceived unfairness to which the dissenters, initially, *see* 336 Md. at 329–31, 648 A.2d at 451–52 (Eldridge, J. dissenting), and the Legislature, later, reacted and which resulted in the amendment of § 5–1038(a) to its present form.

In their opinion, the dissenters castigated the majority for the rigidity of its analysis and the construction it gave § 5–1038, as well as for the unfairness that generated, concluding:

"In light of the basic differences between paternity judgments and the judgments in other types of lawsuits, the majority's holding today, in the words of the Court of Special Appeals, 'defies common sense.' Undoubtedly society interests must yield to the limitations on a court's revisory powers. Nevertheless, a completely rigid adherence to the shibboleth that 'in today's highly litigious society, there must be some point in time when a judgment becomes final,' in the face of irrefutable scientific evidence that a particular individual did not father a given child, with

---

175–76, 577 A.2d 14 (1990) (a court has no authority to terminate a parental relationship other than through a decree of adoption or guardianship). Even if it was the mother's intent to terminate John's child support payments by changing her child's name, the result would be no different. In *Stambaugh v. Child Support Enforcement Admin.*, 323 Md. 106, 591 A.2d 501 (1991), we made clear that one parent may not waive his or her child's right to support from the other parent. Id. at 111–12, 591 A.2d 501. See also *Stancill v. Stancill*, 286 Md. 530, 535, 408 A.2d 1030 (1979) (a court may not be handcuffed in the exercise of its duty to act in the best interests of a child by any agreement between the parents). Therefore, the mother could not unilaterally release John from his support obligations by merely changing her child's name. If the courts below concluded that the name change provided a basis for vacating the 1986 paternity judgment, we disagree.

"Moreover, if we were to uphold the lower court's decision in this case, the ramifications could be potentially disastrous. For example, what if the mother in another five years changes her statement again and testifies that John is the father? Should a court at that juncture reinstate the original paternity judgment? In this regard, the policy of finality serves an important purpose—the parties understand their respective rights and need have no concern about future developments changing their rights."

*Tandra S.*, 336 Md. at 322–23, 648 A.2d at 448.

all of the attendant ramifications of such decree, is absurd. Under the majority's view, presumably if the Provincial Court of Maryland in the 1600's had issued a decree that the earth was flat, the absence of 'fraud, mistake or irregularity,' as narrowly defined by this Court, would make that Provincial Court decree sacrosanct. Or, if Rule 2–535(b) were to be given extra-territorial effect, presumably the March 5, 1616, decree by a tribunal in Rome, aimed at Galileo Galilei, and declaring that Copernicanism is erroneous and that the planet earth is the center of the universe, would be given conclusive effect. Like the courts below, I do not believe that all common sense must be abandoned in the name of Rule 2–535(b)."

*Id.* at 330–31, 648 A.2d at 452.

Judging from the presence of the above quoted portion of the dissenting opinion in the bill file, *see* 359 Md. at 412, 754 A.2d at 397, and the General Assembly's emphasis on "a fairness issue at stake here," described by one of the sponsors of the legislation as "the inequality exhibited in the recent publicized cases of 2 men who accepted paternity and child support only to discover they were not the biological father, yet had to continue support payments," testimony of Senator Paula Hollinger before the House Judiciary Committee,[3] the

---

**3.** Senator Hollinger's testimony was as follows:

"I am not here today to testify for a bill dealing with women's rights but rather, to take a stand for men's rights. A case was brought to my attention in the early part of October 1994 when the Court of Appeals handed down a 5–2 decision on a paternity case. The highest court in Maryland ruled that a man who agreed to pay child support but later found he was not the biological father must continue paying child support. The reason for the decision according to Chief Judge Robert C. Murphy's majority opinion was that if paternity cases were not final then children would be left "fatherless and without support". Certainly no one would advocate for that situation; however, I believe there is a fairness issue at stake here and, if passed, SB 114 would amend the code to deal fairly with this issue by authorizing the court to modify or set aside a declaration of paternity under certain circumstances.

\* \* \* \*

". . . In light of the inequality exhibited in the recent publicized cases of 2 men who accepted paternity and child support only to discover

same focus apparently guided the General Assembly to overrule our decision in *Tandra S. See* 359 Md. at 412, 754 A.2d at 397. Clearly, the amendment of § 5–1038(a) was meant to overturn the result in that case.

Noting the likelihood that "the Legislature agreed with the various criticisms of *Tandra S.* in the media and with Judge Eldridge's and Judge Raker's claim that the decision defied 'common sense,' " *id.* at 412–13, 754 A.2d at 397–98, the *Riffe* majority concluded that "it would equally abandon common sense to deny, once again, a putative father the ability to challenge a paternity declaration simply because he has the misfortune of having the declaration entered against him prior to October 1, 1995." *Id.* With that analysis, I agreed, and still do agree. "Clearly," as the *Riffe* majority stated, "the perceived injustices to putative fathers in situations similar to the putative fathers in the *Tandra S.* case could not be remedied by legislation with a strictly prospective effect." 359 Md. at 412, 754 A.2d at 397.

Although accurately characterizing the issue to be decided in that case, i.e. "whether the changes implemented by Chapter 248 extend to paternity declarations entered prior to the effective date of the statute," *id.* at 406, 754 A.2d at 394, the majority in *Riffe* proceeded to hold: "given the legislative history behind Chapter 248, . . . the Legislature intended for blood or genetic tests to be made available, upon a motion, to any putative father seeking to challenge a paternity declaration previously entered against him in which such blood or genetic test evidence was not introduced." *Id.* at 427–28, 754 A.2d at 406. It, consequently, gave the amendment quite a broad interpretation. By that interpretation, putative fathers were relieved from the effects of *Tandra S.* because the Legislature expanded the procedure for remedying the perceived problem by expanding the equitable grounds available for challenging a paternity judgment, by "providing putative

they were not the biological father, yet had to continue support payments, I urge a favorable report on SB 114." 359 Md. at 411, 754 A.2d at 396–97.

fathers with an additional procedure or remedy to challenge prior paternity declarations." *Id.* at 417–18, 754 A.2d at 400.

That is where the *Riffe* majority and I parted company. I would have given the subject amendment a narrow construction, only broad enough to answer the fairness, common sense and rigidity issues generated by *Tandra S. See* 359 Md. at 439–59, 754 A.2d at 412–23 (Bell, C.J. dissenting). Thus, to be entitled to modification under § 5–1038(a), I would have required the production, by the moving party, of the reliable evidence prescribed in that section, that the paternity judgment was in error, naming the wrong person as the father of the child who is its subject. I would not have expanded the equitable grounds for challenging paternity or assisted the moving party to gather the evidence necessary to challenge the judgment. Neither, in my view, was mandated by the amendment of § 5–1038(a). That section requires, I submitted, *id.* at 446, 754 A.2d at 416 (Bell, C.J. dissenting), as a prerequisite to the modification or setting aside of a paternity decree, reliable evidence sufficient to set aside other orders or decrees of an equity court, subsection (a)(2)(i)(1), or a blood or genetic test, "done in accordance with § 5–1029," that excludes the person named in the order as the father. Subsection (a)(2)(i)(2). So interpreted, the amendment provides a mechanism, which, if properly applied, avoids the harsh result in *Tandra S.*

> "Most assuredly, the amendment does not deal with entitlement of a person named in a paternity decree to a blood or genetic test under § 5–1029 or provide any support for the notion ... that blood or genetic tests may now be ordered on demand, in aid of a requested modification of a paternity order, for any, or no, reason, other than the uncertainty that the man may now have concerning his paternity of a child as to whom the court entered the paternity order."

*Id.* at 446, 754 A.2d at 416 (Bell, C.J., dissenting).

That was my view then and it is my view now. Moreover, it is a view that had then, and has now, the advantage of

implementing the Legislature's desire to address a perceived inequity, while, at the same time, avoiding a wholesale disruption of the lives and best interests of children and the system established to promote their interests. It is, after all, the assistance given to those who would challenge the paternity decree after voluntarily agreeing to it and the numbers of those likely to seek such assistance that present the problem[4] —only in the case of those who have amassed arrearages on a paternity decree that they voluntarily agreed to will the issue in this case arise. The numbers decline significantly when the blood, or other genetic test, is not an automatic entitlement just for the asking.

That said, if the six Judges who joined the *Riffe* decision are correct, the consequences to the system and to the young people who are affected cannot be avoided. It is the responsibility—a duty—of parents to support their children, *Thrower v. State ex. rel. Bureau of Support Enforcement,* 358 Md. 146, 159, 747 A.2d 634, 641 (2000); *Middleton v. Middleton,* 329 Md. 627, 631, 620 A.2d 1363, 1365 (1993); *Carroll County v. Edelmann,* 320 Md. 150, 170, 577 A.2d 14, 23 (1990), *Knill v. Knill,* 306 Md. 527, 531, 510 A.2d 546, 548 (1986); *Bledsoe v. Bledsoe,* 294 Md. 183, 193, 448 A.2d 353, 358–59 (1982); *Kerr v. Kerr,* 287 *Md.* 363, 367–368, 412 A.2d 1001, 1004 (1980); *Brown v. Brown,* 287 Md. 273, 281, 412 A.2d 396, 400 (1980); *Rand v. Rand,* 280 Md. 508, 510, 374 A.2d 900, 902 (1977); *Speckler v. Speckler,* 256 Md. 635, 637, 261 A.2d 466, 467; *Johnson v. Johnson,* 241 Md. 416, 419, 216 A.2d 914, 916 (1966); *Bradford v. Futrell,* 225 Md. 512, 518, 171 A.2d 493, 496, (1961); *McCabe v. McCabe,* 210 Md. 308, 314, 123 A.2d 447, 450 (1956); *Kriedo v. Kriedo,* 159 Md. 229–231, 150 A. 720, 721 (1930); *Blades v. Szatai,* 151 Md. 644, 647, 135 A. 841,

---

4. This case suggests the accuracy of my prediction in *Langston v. Riffe,* 359 Md. 396, 449 n. 4, 754 A.2d 389, 418 n. 4 (2000) (Bell, C.J. dissenting), "It is not inconceivable, and, indeed, quite probable, that there will be a number of requests for blood and genetic tests made by men who agreed to paternity, but, now, behind in payments or perhaps regretting the initial decision, will take a shot at obtaining a modification; after all, they have nothing to lose and everything to gain."

842 (1927), not strangers who, when entering an agreement accepting the responsibility of parenthood, believed that they were parents. If, because of fairness and equity concerns, they are permitted, on whim, to look behind that agreement then, once it is determined that they are not the parents, the same, no, an even greater inequity or unfairness, results. The Legislature has decided, *Riffe* instructs, that the law is that post paternity decree blood tests may be had on demand by "fathers," who have admitted to paternity and consented to a paternity decree. Otherwise, that case instructs, non-biological "fathers" would be required "to continue support payments," with the resulting unfairness and assault on common sense. Neither equity nor common sense is furthered by a prospective only application of the § 5–1038(a) amendment. If it is inequitable, and defies common sense, for a non-biological "father" "to continue support payments" after his non-paternity has been determined conclusively, it is even more inequitable and downright unseemly to require that non-biological "father" to pay any arrearages that may have accrued under a decree that assumed he was the father and which, because of his exclusion, has been vacated. In addition to being as much continuing support payments as if the payments were required to be made currently—these payments were for the child's support, after all—such a bifurcation would accentuate the unfairness and run contrary to not only common sense, but the law. Permitting a putative father to shed the title of father because the evidence proves that he is not, is simply a meaningless gesture if he must continue to discharge, or can be required to discharge, the responsibilities flowing from that title. Rather than overruling, and thus correcting, the *Tandra S.* decision, this perpetuates the worst of it without retaining the fiction which, at least, provided a basis for the obligation imposed and its discharge.

The bottom line is, whether the narrow interpretation I advocate is followed or the more expansive one that the Court adopted in *Riffe*, a result that requires a man whose paternity has been vacated because of scientific evidence proving that he did not father a child to continue to pay support for that child,

albeit by way of arrearages accrued while the paternity decree was in effect, is even more inequitable and devoid of common sense than the decision that prompted the legislative action that is the basis for these proceedings. Aware of the Legislature's concern for fairness and logic, I simply cannot, in conscience, embrace a result that does not even pay lip service to those concerns. That the system suffers by a logical and consistent application of the law, and children too, is a factor that I must assume the Legislature considered, especially after our decision in *Riffe*, and resolved, as it has not enacted legislation in response to *Riffe*. *See generally, Prince George's Co. v. Vieira*, 340 Md. 651, 667 A.2d 898 (1995); *Police Comm'r of Baltimore City v. Dowling*, 281 Md. 412, 419, 379 A.2d 1007, 1011 (1977); *Harden v. Mass Transit Admin.*, 277 Md. 399, 407, 354 A.2d 817, 821 (1976)(presuming the Legislature to have acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law).

WILNER, Judge, dissenting.

Despite Judge Cathell's valiant attempt in *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000), to avoid the sorry result reached by the Court today, that result, unfortunately, was predictable, as, I fear, is the result in the next assault likely to be made on efforts to assure the decent support of children—the right of disavowing fathers to recover back from their children the meager support they actually may have paid. The decision today not only demonstrates how wrong the Court was in *Langston*, but egregiously compounds the error.

The Court says that it is not deciding the issue in this case, but, absent some additional legerdemain, on what basis will it hold that, with parenthood extinguished, the once-self-confessed father is retroactively relieved of all responsibility for court-ordered child support he *failed* to pay but cannot recover the same court-ordered child support that, through a newly asserted theory of fraud or mistake of fact, he *did* pay? If the Court, being intellectually honest, found no distinction, it

would be faced with the unattractive prospect of forcing mothers and children to repay support already duly paid and spent. If the Court, to avoid that tarpit, conceived some basis for drawing a distinction, it would have the equally pernicious effect of rewarding such fathers who fail to pay court-ordered child support. Few of these men will read this opinion, of course, but the message will quickly spread: in paternity cases, you are a fool if you actually pay the child support. If there is even the slightest doubt in your mind regarding your paternity, consent to paternity, consent to pay child support, but don't actually pay it. In the name of protecting the rights of men who father children and then walk away from them, the Court of Appeals has so dismantled the system for enforcing child support collection that, unless you are expecting a tax refund, are looking to win the lottery, or are truly concerned about driving on a suspended license, there will be no effective sanction, and, if the time ever comes, years later, when you may be held to account, ask for a blood test. If you are lucky, you will escape all responsibility and may, when the next case is decided, actually be able to force your child to return anything you were ever forced to pay.

The Legislature drew a balance when it enacted ch. 248 in 1995, permitting men to challenge paternity and support orders after their enrollment and, if excluded by blood or genetic test results, to avoid *further* responsibility for child support. That is a permissible legislative call. It is this Court that has made a mess of it, first by giving the statute a retroactive application and now by providing a powerful new incentive for men to ignore both the responsibility they voluntarily assumed and their obligation to obey court orders. No one forced Nicholas Todd Walter to admit that he was the father of Taylor Gunter. He obviously believed that he was the father and, if he had any doubt about the matter, as he now claims he did, he could have forced the mother to prove his paternity in court. Based solely on his own admission, that issue was never adjudicated, and he was ordered to pay $43/week for the support of the child, an amount he neither contested nor paid. The gross arrearage of $12,303, deter-

mined as of September, 2000, indicates that he was about 286 weeks-five-and-a-half years—in arrears. And today, the Court rewards him for that defiance. Respectfully, I dissent.

HARRELL, Judge, dissenting, joined by RAKER, J.

I dissent. Judge Battaglia, who had not yet joined the Court when it decided *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000), has performed, in the Majority Opinion's discussion of *Langston* (Maj. op. at 399–403), as capably as possible in explaining away the damning dicta [1] from *Langston*. I, on the other hand, hobbled by having joined the Majority in *Langston*, am unable to subscribe to her rationale. I know what it meant to me when I subscribed to Judge Cathell's thoughtfully considered and essential-to-the-outcome reasoning when he explained why § 5–1038 of the Family Law Article (Chp. 248, Laws 1995) could be given retrospective effect in those combined cases because no vested or substantive rights would be interfered with:

> A most natural definition of the term "vested" is "accrued" or, as dictionaries put it, "completed and consummated." But in that sense, any claim or interest which has become into being and been perfected as "a right" would have to be said to be vested....
>
> ... Justice Holmes once remarked with reference to the problem of retroactivity that "perhaps the reasoning of the cases has not always been as sound as the instinct which directed the decisions," and suggested that the criteria which really governed decisions are "the prevailing views of justice." The problem is to comprehend what real considerations influence judgment in application of "the prevailing views of injustice."

---

1. It matters not whether the reasoning from *Langston* is labeled dicta. The relevant language from *Langston* is a clear example of the "application of the judicial mind to the precise question adjudged." *See Schmidt v. Prince George's Hospital*, 366 Md. 535, 552, 784 A.2d 1112 (2001) (No. 119, September Term, 2000) (citations omitted). Others in the Majority in *Langston* now may be willing to relegate that language to an intellectual "oops" or an aside; I am not.

... It is impossible to discover the precise meaning of the term through which all of the decisions can be consistently explained. Most of the numerous attempts at definition are essentially circuitous in nature, as in the pronouncement that "a vested right, as that term is used in relation to constitutional guarantees, implies an interest which it is proper for the state to recognize and protect, and of which the individual may not be deprived arbitrarily without injustice." Thus "vested right" means simply a right which under particular circumstances will be protected from legislative interference. Another definition notes that a vested right is an immediate right of present enjoyment or a present fixed right of future enjoyment.

2 [Norman J. Singer, *Sutherland's Statutory Construction*] §§ 41.05, 41.06, at 369–70, 379 [(1999 Suppl.)] (footnotes omitted). *See Washington Nat'l Arena Ltd. Partnership v. Treasurer,* 287 Md. 38, 46 n. 4, 410 A.2d 1060, 1065 n. 4 ("[I]t has long been recognized that the term 'vested right' is conclusory—a right is vested when it has been so far perfected that it cannot be taken away by statute.") (quoting Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv. L.Rev. 692, 696 (1960)), *cert. denied,* 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980).

Given these definitions, Chapter 248 does not appear to interfere with any substantive or vested rights in the cases *sub judice.*

\* \* \* \* \*

Regarding "vested" rights, the Act does not appear to destroy or modify any vested right belonging to the children in these paternity cases. The State, on behalf of petitioner Danielle and appellees Riffe and Locklear, suggests that certain rights of the children vested upon the entry of the original paternity declarations. The State does not specify what "vested" rights those would be, but does insinuate that three rights might apply to this analysis: (1) inheritance rights; (2) Social Security benefits; and (3) child support.

\* \* \* \* \*

Our holding does not apply to the support already paid by putative fathers and to the arrears they owe in support. Those property rights are already accrued. It would clearly raise problems, particularly in the areas of takings and due process, for this Court to interpret the statute to extend the retroactive application of Chapter 248 so far that a child must pay back support already claimed, adjudicated, received, and expended through a paternity-related child support, or other compensatory order, during the period it was legally in effect. Likewise, this reasoning applies to any debt owed by a putative father through the prior support or compensatory order, which is enforceable at least until the putative father initiates proceedings to attack the paternity declaration to which the order relates. *See 2 id.* § 41.06, at 380 ("A vested right has been equated with 'property' in order to qualify it for protection from arbitrary interference."); *cf. Washington Nat'l Arena Ltd. Partnership*, 287 Md. at 55, 410 A.2d at 1070 (holding that retroactive application of a county tax increase on property recordations to recordations made prior to the increase would "impair property rights" in violation of the federal and state constitutions); *cf. also Ferguson v. State ex. rel. P.G.*, 977 P.2d 95, 98–101 (Alaska 1999) (holding that a putative father, proven not to be the father by blood tests, was entitled only to prospective relief under Alaska's revisory rule and, thus, was still liable for child support arrearages).

*Langston*, 359 Md. at 419–23, 754 A.2d at 401–05 (internal footnotes and some citations omitted).

The "now non-paternal 'father'" in the instant case, Walter, inexplicably allowed the accrued and unpaid child support arrearages to accumulate.[2] Based on the factual record in this case, it appears he could have avoided virtually all of the arrearages, but, because of unexplained lack of diligence, he

---

**2.** Of the $12,303 owed as of the 20 March 2000 filing of his motion for genetic testing, $8,159.67 was owed to the child directly and $4,143.33 to the Department of Social Services for public assistance already paid for the child's benefit in the absence of Walter's support payments.

allowed the consent declaration of paternity to go unquestioned for almost 7 years.

In his 30 March 2000 motion for paternity test, Walter stated that "[s]ince the birth of the child [3] I have been told by her [4] family members that the child is not mine." At the 19 October 2000 hearing before the Circuit Court master, following receipt of the result of the genetic test, Walter's attorney argued that the reason he consented to the 30 September 1993 paternity declaration and support order [5] was that he had been misled by Ms. Gunter's representation that he was the only man with whom she had sexual intercourse within 30 days of the child's conception. Even though the falsity of that representation was confirmed as of the master's 19 October 2000 hearing, Walter's counsel asserted:

> Mr. Walter's position is real simple, he feels like, and I am not using this as a term of art, I am using it as the way that he sees it, he feels like he was degraded, like he was lied to, and that he never was the father. *There was always a question.* There should have always been a question, in fact, in the mother's mind. (Emphasis supplied).

Walter offered no insight as to why he waited until 30 March 2000 to seek genetic testing. Thus, it seems that Walter's level of doubt as to his paternity remained constant and high from some time proximate to the child's birth in 1992 until 30 March 2000 when he sought genetic testing, a period spanning some 7 years. His own lack of diligence created his current predicament and manufactured the legal issue he urges upon the Court in the instant case.

I would hold that the child support arrearages, both the amount owed to the child and the amount of public assistance reimbursement owed to the DSS, accrued through and as of 30 March 2000 (the date Walter moved for a genetic test), were

---

3. The child was born on 3 September 1992.

4. It is unclear whether he was referring here to the child or the mother.

5. Walter also waived his statutory right to demand genetic testing in 1993.

vested rights of those entities that could not be interfered with as a result of the retrospective effect sought to be given to the 28 September 2000 declaration of Walter's non-paternity. Thus, because he owes these debts, he is subject to whatever legal vehicles exist to enforce their recovery.