*William Bailey, Sr. v. Jamia Happer*, No. 0685, September Term, 2024. Opinion by Getty, Joseph M., J.

**HEADNOTES:**

SAFE ACT – RETROACTIVE APPLICATION

The SAFE Act may not be applied retroactively. However, a statute does not operate retroactively merely because it is applied in a case arising from conduct antedating the statute's enactment. Therefore, a court is permitted to consider an alleged exploiter's entire course of conduct, including conduct which occurred before the effective date of the statute, when evaluating a SAFE Act claim.

SAFE ACT – BURDEN OF PROOF

A claim of financial exploitation under the SAFE Act, as a civil cause of action, must be proven by a preponderance of the evidence.

Circuit Court for Prince George's County
Case No. C-16-CV-22-000864

_____


WILLIAM BAILEY, SR.

v.

JAMIA HAPPER

_____

Friedman,
Albright,
Getty, Joseph M.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Getty, J.

_____

Filed: February 25, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The Maryland General Assembly passed new legislation to protect vulnerable and elderly citizens during the 2021 legislative session through Senate Bill 327 titled "Civil Actions – Financial Exploitation of Susceptible Adults and Older Adults (Maryland SAFE Act)." 2021 Md. Laws Ch. 311. Known as the Statute Against Financial Exploitation ("SAFE") Act, the intent of the legislation is to combat the financial exploitation of susceptible and older adults in Maryland. The Act creates a civil cause of action through which a victim of financial exploitation, or a representative of such a victim, may file a civil lawsuit to obtain compensatory damages and other relief from the exploiter.

Appellee, Jamia Happer, the grand-niece of Diane Delores Terrell, now deceased, brought an action under the SAFE Act against Appellant, William Bailey, Sr., alleging that Mr. Bailey financially exploited her great-aunt, Ms. Terrell, from 2016 through 2023. Ms. Happer prevailed on her claim and the Circuit Court for Prince George's County awarded Ms. Terrell $395,310 in damages.

Mr. Bailey maintains that he did not financially exploit Ms. Terrell and raises three questions for our review, which we have rephrased as follows:[1]

1. Did the circuit court err in applying the SAFE Act retroactively when the language of the act provides for prospective application only?

---

[1] Mr. Bailey's verbatim questions presented are:
   1. Was the SAFE Act intended to apply to facts that occurred before its enactment?
   2. In cases brought under the SAFE Act, does the burden of proof shift to the accuse [sic] exploiter to justify why an adult placed trust in him?
   3. Whether defendant's payment of tithes to churches on behalf of Diane Terrell from joint bank accounts on which he was a co-owner violated the SAFE Act?

2. Did the circuit court improperly shift the burden of proof onto Mr. Bailey when it commented on the suspicious nature of Mr. Bailey's relationship with Ms. Terrell?

3. Was the circuit court clearly erroneous when it determined that Mr. Bailey's numerous payments to churches from Ms. Terrell's accounts were not a "good-faith use" of her assets?

As we explain, we answer all the above questions in the negative and will affirm the judgment of the Circuit Court for Prince George's County.

## FACTUAL BACKGROUND

This case centers around the relationship between Mr. Bailey and Ms. Terrell, who were barely acquaintances prior to 2016. Mr. Bailey described himself as Ms. Terrell's "friend" and testified that the two first met in the 1980s when they were both working for the District of Columbia Public Schools. According to Mr. Bailey, the two only saw each other in passing through the 1980s and 1990s and had very little contact throughout the first fifteen years of the twenty-first century.

Then, in 2016, Mr. Bailey began accompanying Ms. Terrell to her medical appointments and assisting her with other household chores and responsibilities. In doing so, he built up a level of trust in their relationship and began assisting with Ms. Terrell's financial affairs. On August 3, 2016, Mr. Bailey was added to two of Ms. Terrell's bank accounts as a joint owner with a right of survivorship.[2] Also included on Ms. Terrell's bank

---

[2] A "right of survivorship" is a legal feature of jointly-owned property that allows ownership of the property to automatically transfer to the surviving co-owner(s) upon the death of one owner. *See Wagner v. State*, 445 Md. 404, 430 (2015) (describing "survivorship rights" as an account party's right to funds in an account upon the death of another account party).

accounts was William Terrell, Ms. Terrell's brother and Ms. Happer's grandfather. Mr. Terrell lived with Ms. Terrell and also assisted her with her finances until his death in December 2021.

During this time period, Ms. Terrell was experiencing cognitive decline. In May 2016, Ms. Terrell underwent a cognitive assessment test that revealed mild cognitive impairment, which then escalated to near global cognitive impairment by July 2017. Also in July 2017, Ms. Terrell executed a power of attorney authorizing Mr. Bailey to manage her finances. An additional power of attorney was executed in August 2019, as was a living will authorizing Mr. Bailey to act as Ms. Terrell's health care agent.[3] The validity of these documents was later disputed as Ms. Happer presented evidence at trial that the documents had been forged and that Ms. Terrell lacked the mental capacity to execute them.

Starting in September 2016, Mr. Bailey began making cash withdrawals from the bank's automated teller machines ("ATM") for Ms. Terrell's bank accounts. Beginning in March 2017, Mr. Bailey also began writing checks to local churches from Ms. Terrell's accounts. The overwhelming majority of these checks were made to the Gethsemane Baptist Church, of which Mr. Bailey has been a deacon for over thirty years. This course of conduct continued until 2023, when the court intervened as described below.

---

[3] The living will described herein details Ms. Terrell's wishes for her health care should she be determined to have a terminal condition, and therefore operates as an advance medical directive. Section 5-602(a)(1) of the Health – General Article of the Maryland Code provides: "Any competent individual may, at any time, make a written or electronic advance directive regarding the provision of health care to that individual, or the withholding or withdrawal of health care from that individual." We refer to this document as a living will, however, because the particular document at issue here was entitled "Living Will of Diane Delores Terrell."

3

In August 2022, Ms. Happer, after becoming concerned about Ms. Terrell's well-being and Mr. Bailey's actions, petitioned the Circuit Court for Prince George's County for the appointment of a guardian. In May 2023, the circuit court appointed Ms. Happer as the guardian of Ms. Terrell's person and appointed an independent guardian for Ms. Terrell's property. The court declared the 2017 and 2019 powers of attorney and the 2019 living will to be void, and further ordered that all bank accounts be retitled solely in Ms. Terrell's name. The court also prohibited Mr. Bailey from taking any additional money from her accounts, including contributions to local churches.

While the guardianship proceeding was pending, Ms. Happer also filed a separate civil complaint which is the subject of this appeal. In November 2022, Ms. Happer, acting on behalf of Ms. Terrell, filed this civil complaint in the circuit court against Mr. Bailey, asserting six counts for relief: (I) a request for an accounting of Mr. Bailey's use of Mr. Terrell's funds; (II) damages for financial exploitation under the SAFE Act; (III) an injunction against further financial exploitation under the SAFE Act; (IV) immediate removal of Mr. Bailey as Ms. Terrell's power of attorney; (V) a declaratory judgment stating that the 2019 power of attorney is invalid; and (VI) a declaratory judgment stating that the 2019 living will is invalid. The disposition of the guardianship proceeding rendered Counts IV, V, and VI moot, and the trial proceeded only on the SAFE Act claims.

A two-day bench trial was held in December 2023. The circuit court heard testimony from Ms. Happer and Mr. Bailey, and from four additional witnesses: (1) a forensic psychiatry expert who reviewed Ms. Terrell's neurology records; (2) a forensic document examiner who conducted a signature analysis on the 2019 power of attorney and living

4

will; (3) the appointed guardian of Ms. Terrell's property, and (4) a certified public accountant who had reviewed Ms. Terrell's financial records.

At trial, Mr. Bailey argued that the numerous payments, both to himself and to Gethsemane Baptist Church, were made either for Ms. Terrell's benefit or in accordance with her wishes. Specifically concerning the payments to Gethsemane Baptist Church, Mr. Bailey claimed that he knew Ms. Terrell to have a practice of donating to churches and that those payments were part of a good-faith effort to reduce Ms. Terrell's taxes. However, Ms. Terrell's membership and the extent of her involvement with Gethsemane Baptist Church was disputed at trial. Mr. Bailey's own testimony on this matter was inconsistent. In one portion of his testimony, he testified that Ms. Terrell attended Gethsemane Baptist Church dating back to the 1980s, and at another time during that same testimony he testified that she did not begin attending until as late as 2018. As to the cash withdrawals, Mr. Bailey produced no receipts for expenses or any other accounting for what that money was spent on.

The circuit court found that Mr. Bailey had expended $131,770 of Ms. Terrell's money since 2016. Within that sum was $60,850 in ATM withdrawals to Mr. Bailey directly, $55,000 paid to churches, and an additional $15,000 from Ms. Terrell's funds that Mr. Bailey used to pay his own legal fees. The court also found that the power of attorney and living will documents "were either not signed by Ms. Terrell or she did not have the capacity to agree to – or understand what she was signing over." Similarly, "the Court also believe[d] that by the time she made Mr. Bailey a co-owner on her bank accounts that she really did not understand what she was doing." The court then found that Mr. Bailey

5

"violated the [SAFE] Act, that he took advantage of a vulnerable adult," and assessed treble damages.[4]

The court entered judgment against Mr. Bailey on February 28, 2024, in the amount of $395,310. Mr. Bailey filed a motion to alter or amend the judgment on March 4, 2024, which was denied on May 6, 2024. Mr. Bailey then timely noted his appeal on June 4, 2024. Ms. Terrell passed away in July 2024.

## STANDARD OF REVIEW

"When an action has been tried without a jury, an appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). Appellate courts accept and are bound by findings of fact in the lower court unless they are clearly erroneous. *Cunningham v. Feinberg*, 441 Md. 310, 322 (2015) (quotations omitted). However, "the clearly erroneous standard for appellate review . . . does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact." *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 567 (2008) (internal quotations omitted). Where a judgment "involves an interpretation and application of Maryland statutory and case law, [an appellate court] must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review." *Walter v. Gunter*, 367 Md. 386, 392 (2002).

---

[4] Treble damages are a legal remedy where the court will award the plaintiff three times the amount of actual damages. The court found the actual damages here to be $131,770.

# DISCUSSION

## THE MARYLAND SAFE ACT

Before addressing the parties' contentions, we think it prudent to provide a brief overview of the legislative history of the Maryland SAFE Act.

In 2021, the General Assembly enacted the Maryland SAFE Act, legislation that was proposed by the Vulnerable Adult Financial Exploitation Task Force ("Task Force"). This Task Force was organized by the Maryland State Bar Association primarily through the work of two section councils—the Estate and Trust Law Section and the Elder Law and Disability Rights Section. The purpose of the Task Force was to "provide an interdisciplinary approach to tackling the vexing concerns around financial exploitation of vulnerable adults." *See* Bill File to S.B. 327, Testimony – Written Statement of the Vulnerable Adult Financial Exploitation Task Force in Support of S.B. 327 (2021).

The creation of this Task Force came in response to a 2009 national study which stated that up to one million older Americans could become the targets of elder abuse and financial exploitation, and that the related costs of such abuse—including health care, social services, investigations, legal fees, prosecution, lost income, and lost assets—could reach tens of millions of dollars annually.[5] *Id.* According to the Maryland Chapter of the National Association of Social Workers, another organization which supported this legislation, financial exploitation is one of the fastest-growing forms of abuse in Maryland.

---

[5] The study, commonly referred to as the MetLife Study, was jointly published by the MetLife and VPI Mature Market Institute, the National Committee for the Prevention of Elder Abuse ("NCPEA") and Virginia Polytechnic Institute and State University, and entitled *Broken Trust: Elders, Family and Finances*.

In their testimony, they stated that Adult Protective Services in Maryland investigated 408 cases of financial exploitation in 2019. *See* Bill File to S.B. 327, Testimony – Written Statement of the National Association of Social Workers, Maryland Chapter in Support of S.B. 327 (2021). Additionally, those who have been financially abused experience increased depression, social isolation, morbidity and mortality. *Id.*

The Task Force identified a significant gap in the existing Maryland law surrounding financial exploitation, noting that remedies at that time were limited to criminal actions. *See* Written Statement of the Vulnerable Adult Financial Exploitation Task Force, *supra.* The Task Force found criminal actions to be largely ineffective due to the reluctance of victims to involve police in family matters, the high burden of proof necessary to obtain a conviction, and the limited resources available to state-funded agencies to handle these cases. *Id.* To redress this issue, the Task Force developed the proposed legislation for the SAFE Act. *Id.* The Act created a civil cause of action for financial exploitation, as defined under the bill, which can be brought directly against the alleged exploiter by the victim or by a representative of the victim. *See* S. Comm. on Jud. Procs., Floor Report on Senate Bill 327, 2021 Leg., Reg. Sess. (Md. 2021). In addition, the SAFE Act expands available remedies to include compensatory damages, treble damages, attorneys' fees, and equitable relief.[6] *Id.*

---

[6] The original bill provided for "punitive" damages, which were described as "an amount not exceeding three times the compensatory damages and prejudgment interest." This provision was struck by the Senate Judicial Proceedings Committee, but the House Judiciary Committee restored the treble damages language – *i.e.* "an amount not exceeding three times the compensatory damages." The final enrolled bill eliminated any reference to punitive damages but retained the provision authorizing treble damages: "A party who

The Act was introduced in the General Assembly as Senate Bill 327 during the 2021 legislative session and was passed unanimously. It was signed by the Governor as Chapter 311 in May 2021 and went into effect on October 1, 2021. The provisions relating to the civil cause of action are codified in Title 13 of the Estates and Trusts Article ("ET") of the Maryland Code.

The SAFE Act contains both a preamble and a statement of legislative intent.[7] The statement of legislative intent included within the statutory text highlights the concerns the Task Force was hoping to address through this legislation:

The purposes of this subtitle are to:

(1) Establish a separate and distinct civil cause of action by a victim, or representative of the victim, of financial exploitation;

(2) Provide a path to redress financial exploitation through the recovery of property and assets taken from victims while discouraging protracted litigation;

(3) Provide access to justice for victims and their families who are otherwise unable or unwilling to retain competent legal assistance due to cost; and

---

brings an action under this subtitle to recover for injury or loss and is awarded compensatory damages may also seek and the court may award an amount not exceeding three times the compensatory damages and prejudgment interest." 2021 Md. Laws Ch. 311.

[7] A preamble and a statement of legislative intent are both used to describe the purpose and intent of a law. A preamble is placed in a bill between the title and the first enacting clause and is always uncodified. *Wash. Gas Light Co. v. Md. Pub. Serv. Comm'n*, 460 Md. 667, 684 (2018) (citing Dep't Leg. Servs., *Legislative Drafting Manual 2013*, at 152–53 (2012)). Alternatively, the body of a bill may include a codified section stating the legislature's intent, purpose, or findings, known as a statement of legislative intent. *Id.* "Such a statement *may have more legal formality* than one that is not codified[.]" *Id.* (emphasis in original) (internal quotations omitted). Section 13-602 here is a codified statement of legislative intent, and therefore retains greater legal formality and is an operative section of the SAFE Act.

(4) Strongly deter individuals seeking to take advantage of susceptible adults or older adults.

ET § 13-602. The statute also directs that the SAFE Act is to be "construed and applied liberally to promote its purpose of deterring and remedying the financial exploitation of susceptible adults or older adults." ET § 13-608(a).

The Act also has two uncodified special sections, Sections 2 and 3, which provide:

SECTION 2. AND BE IT FURTHER ENACTED, That this Act shall be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any cause of action arising before the effective date of this Act.

SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2021.

2021 Md. Laws Ch. 311. These special sections are typical in bills and are used to clarify the bill's application. The prospective application clause is included because, although there is no specific prohibition against retroactive civil laws, retroactive laws that impair "vested rights" violate the Maryland Constitution and are therefore disfavored. *See Legislative Desk Reference Manual*, Dep't of Legis. Servs., at 111–16 (2018). The effective date clause is always numbered and placed last. *See Legislative Drafting Manual*, Dep't of Legis. Servs., at 138–43 (2020). The standard effective date of a bill is October 1 following the session at which the bill was enacted to allow time for the publication of new laws. *Id.* at 138–39.

With this history and legislative intent in mind,[8] we now turn to the merits of Mr. Bailey's claims of error in the circuit court's application of the SAFE Act in this case.

## RETROACTIVITY

Mr. Bailey's first argument on appeal is that the circuit court improperly applied the SAFE Act here because the majority of his conduct occurred before the Act's effective date—October 1, 2021—and the Act "would not retroactively apply to actions or conduct

---

[8] We cite several documents bearing on legislative intent to support our reasoning in this case. We take the opportunity presented by this appeal to note that "not all legislative history has equal value[.]" Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: the Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 437 (1995). The legislative sources and documents in a bill file that are most authoritative in any given appeal will vary, depending on the issues presented, but we offer now some general principles shared by Schwartz and Conn with which we agree.

"General Assembly documents that are most likely to reflect actual legislative purpose" are "fiscal notes, committee bill analyses, and floor reports." *Id.* at 462. Where work groups such as those referenced in this appeal result in proposed legislation, their sources can be invaluable in determining legislative intent. *Id.* at 440–41. Similarly, sponsor testimony can be helpful in identifying the purpose of legislation. *Id.* at 451. When requested, advice from Counsel to the General Assembly can shed light on legislative intent. *Id.* at 443. Finally, testimony or material provided by people or organizations at committee hearings are generally advocacy statements that may have a more limited purpose. *See id.* at 446. However, such testimony is useful when it addresses controversial provisions in the legislation and thus provides insights on amendments offered during the legislative process.

Here, we rely on the committee floor report of the Senate Judicial Proceedings Committee as the best indicator of the legislature's intent because it was prepared by committee staff as the work on the bill proceeded in the committee. Also, in this case, we have the report of the Vulnerable Adult Financial Exploitation Task Force and witness testimony of task force members that provide reliable sources for the analysis of the General Assembly's legislative intent.

11

that took place prior to its enactment." Ms. Happer contends that because Mr. Bailey did not raise this issue at any time in the circuit court, he failed to preserve the issue for appeal.

"Ordinarily, an appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]" Md. Rule 8-131(a). The policy behind this rule "is to ensure fairness for the parties involved and to promote orderly judicial administration." *Jones v. State*, 379 Md. 704, 714 (2004). However, this prohibition is not absolute. "The word 'ordinarily' in Rule 8-131(a) anticipates that an appellate court will, on appropriate occasion, review unpreserved issues." *Id.* at 712.

The determination as to when is an "appropriate occasion" is guided by the second half of the rule: "the Court *may decide* such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." Md. Rule 8-131(a) (emphasis added). Thus, under the rule, an appellate court has discretion to consider an issue even though it was not properly raised or preserved by a party. *Jones*, 379 Md. at 713. "In considering whether to exercise this discretion, this Court examines, through a two-step analysis, whether such an exercise will further or hinder the goals of Rule 8-131(a): 'First, the appellate court should consider whether the exercise of its discretion will work unfair prejudice to either of the parties. . . . Second, the appellate court should consider whether the exercise of its discretion will promote the orderly administration of justice.'" *King v. State*, 434 Md. 472, 480 (2013) (quoting *Jones*, 379 Md. at 713–715).

Here, no unfair prejudice results to either of the parties or the lower court in our reviewing Mr. Bailey's retroactivity argument. Mr. Bailey raises the issue and therefore,

12

waives any prejudice against him. Neither Ms. Happer nor the lower court is prejudiced by the resolution of this issue because, as will be seen, our conclusion will affirm the lower court's ruling in Ms. Happer's favor. Furthermore, the exercise of our discretion here is "desirable to guide the trial court[.]" Md. Rule 8-131(a). The question of whether conduct predating the SAFE Act's enactment can be considered when evaluating a financial exploitation claim is likely to recur in future SAFE Act cases. Our decision on this issue will provide necessary guidance and "promote the orderly administration of justice." *Jones*, 379 Md. at 715. Therefore, we choose to exercise our discretion to address Mr. Bailey's retroactivity argument, despite his failure to preserve the issue.

Mr. Bailey claims that the SAFE Act does not permit retroactive application. We agree. Whether a statute operates retrospectively or prospectively is a question of legislative intent. *Langston v. Riffe*, 359 Md. 396, 406 (2000). Absent a manifest legislative intent to the contrary, statutes are presumed to operate prospectively and may not be given retrospective or retroactive application. *Gregg v. State*, 409 Md. 698, 714 (2009). Here, we need not presume that the General Assembly intended the SAFE Act to operate prospectively because it said so explicitly. The uncodified language in Section 2 of the chapter law explains: "this Act shall be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any cause of action arising before the effective date of this Act." 2021 Md. Laws Ch. 311.

Ms. Happer's claim does not run afoul of this provision. "A statute does not operate 'retrospectively' [or retroactively] merely because it is applied in a case arising from conduct antedating the statute's enactment[.]" *In re M.P.*, 487 Md. 53, 86 (2024) (quoting

13

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994)). "Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct[.] . . . Moreover, a statute 'is not made retroactive merely because it draws upon antecedent facts for its operation.'" *Landgraf*, 511 U.S. at 269 n.24 (quoting *Cox v. Hart*, 260 U.S. 427, 435 (1922)).

Mr. Bailey's constant expenditures from Ms. Terrell's accounts were part of a course of conduct that spanned nearly eight years and continued until nearly two years *after* the SAFE Act was enacted. As such, this was an ongoing act of financial exploitation that satisfies our past precedent that, although certain facts predate the effective date of the bill, the application of this statute is not retroactive, and the circuit court did not err.

Ms. Happer first discovered Mr. Bailey's involvement in Ms. Terrell's finances in August 2022—nearly a year after the law went into effect. Accordingly, that is when her cause of action arose because that is when she discovered the facts constituting financial exploitation. *See* ET § 13-607(a) (stating that the statute of limitations begins, *i.e.*, a claim accrues, when "the susceptible adult or older adult, or the susceptible adult's or older adult's representative discovers or, through the exercise of reasonable diligence, should have discovered the facts constituting financial exploitation"). Moreover, it is undisputed that Mr. Bailey made numerous withdrawals from Ms. Terrell's accounts after October 1, 2021, any of which would have exposed him to liability.

Notwithstanding, Mr. Bailey argues that the damages award should have been limited to only those expenditures which occurred after October 1, 2021, and that the court's inclusion of all his withdrawals dating back to 2016 was an erroneous retroactive

14

application of the statute. We are unpersuaded. Because of Maryland precedent on what constitutes retroactive application of a statute, the circuit court did not err, and we will not require the circuit court to parse out individual transactions in an ongoing course of conduct and shield Mr. Bailey from liability for his entire act of financial exploitation merely because some of his conduct antedated the statute's enactment. *In re M.P.*, 487 Md. at 86. The circuit court did not retroactively apply the SAFE Act merely because the court drew upon relevant antecedent facts in evaluating Ms. Happer's claim.

### SHIFTING THE BURDEN OF PROOF

Mr. Bailey's second contention is that that the circuit court improperly shifted the burden of proof because the court commented on the lack of evidence presented concerning the nature of his relationship with Ms. Terrell and the lack of explanation for why she entrusted him with her finances. He argues that it was erroneous for the court to rely on this lack of evidence when he presented a narrative that he was "a God-fearing individual who selflessly assisted his friend during a challenging time."

In support of his argument, Mr. Bailey points to remarks made by the trial judge during the disposition hearing. When making the ruling of the court, the judge commented on the suspicious nature of Ms. Terrell's and Mr. Bailey's relationship, saying:

> At the outset, the Court will say what really overhangs this whole thing – and, at least for me, is that the [sic] genesis of the relationship between Mr. Bailey and Ms. Terrell and the nature of the relationship between Mr. Bailey and Ms. Terrell. And at this point, the only people who can speak to that are Mr. Bailey and Ms. Terrell. Ms. Terrell is not in a position to do so. And Mr. Bailey is the only one who can.

15

Mr. Bailey argues that these comments demonstrate that the judge was placing the burden on him to explain Ms. Terrell's reliance on him. In response, Ms. Happer contends that the record is devoid of any indication that the court shifted the burden of proof.[9]

Although the trial judge here did not state on the record what standard of proof the court was applying, "[j]udges are presumed to know the law." *Hebb v. State*, 31 Md. App. 493, 499 (1976). "Absent an indication to the contrary, we must assume that judges apply the law correctly to the case before them." *Id.* Even when the record is silent as to the standard of proof applied by the judge, that does not suggest that the judge applied the incorrect law or made a mistake. *See id.; see also Aeropesca Ltd. v. Butler Aviation Intern., Inc.*, 44 Md. App. 610, 624 (1980) (stating that there was "no requirement" that the trial judge articulate which standard of proof the court was applying).

We agree with Ms. Happer that there is no indication that the court shifted the burden of proof onto Mr. Bailey. The comments Mr. Bailey takes issue with instead indicate the trial judge's determination of Mr. Bailey's credibility, especially when considered in their full context. In the remarks at issue, the judge articulated the court's

---

[9] Ms. Happer also contends that the court should have shifted the burden of proof here on the basis that Mr. Bailey stood in both a fiduciary relationship and a confidential relationship with Ms. Terrell. We find this argument inapplicable to the case before us for two reasons. First, the 2019 power of attorney that Ms. Happer claims created a fiduciary relationship was declared void by the circuit court in the guardianship proceeding, and therefore had no legal effect. Second, the burden-shifting framework for confidential relationships that Ms. Happer cites to operates in the context of an *inter vivos* gift of property. *See Upman v. Clarke*, 359 Md. 32, 41–43 (2000). There is no allegation here that Ms. Terrell at any time gifted Mr. Bailey any portion of her property. Mr. Bailey testified to the same, acknowledging that he understood that Ms. Terrell's money was to be used for her benefit and that she was not gifting the money to him.

16

understanding of Mr. Bailey's and Ms. Terrell's relationship as it was described by Mr. Bailey and then stated:

> So – and I will be honest with you, I don't believe that Mr. Bailey is telling – this is the Court's view. Mr. Bailey isn't telling the full story for whatever reason. And perhaps had he told the whole story, the Court would have a better understanding about why a woman who, even by his own testimony, barely knew him would make him a co-owner on her bank accounts and given the substantial amount of money that she had. I just – but Mr. Bailey, he wants to keep that secret to himself. He is certainly free to do so. I just say that it makes it difficult for the Court to believe that Ms. Terrell turned over all of these things to him who, by his own testimony, they had just a friend relationship, that prior to 2015, had been nothing more than a friend relationship, one, which they didn't even really socialize.

The judge's comment that Mr. Bailey was not "telling the full story" suggested that the judge did not find him to be a credible witness. This determination was precisely the court's duty in its role as factfinder. *See Rawlings v. Rawlings*, 362 Md. 535, 563 n.26 (2001) ("The credibility of a witness is a matter for the trier of fact to determine."). A negative credibility finding does not shift the burden of proof.

### SUFFICIENCY OF THE EVIDENCE

Although we will not disturb the circuit court's determination as to Mr. Bailey's credibility, "[n]egative credibility determinations—alone—are never enough to sustain a party's burden of proof." *Clarke v. Gibson*, 492 Md. 557, 589 (2025). This brings us to Mr. Bailey's third claim of error here, which is that the circuit court did not credit his testimony that all his expenditures from Ms. Terrell's accounts were either for her direct benefit or in accordance with her wishes, and thus not financial exploitation. He argues that "the evidence [did] not support the trial judge's determination that Ms. Terrell lacked the capacity to make decisions or that Mr. Bailey engaged in financial exploitation."

17

Before assessing the sufficiency of the evidence presented in this case, we will clarify the burden of proof that applies to Ms. Happer's claim. The SAFE Act does not expressly state which burden of proof should be used in a financial exploitation case, but does clearly say that the Act "is not intended to alter or amend the burdens of proof or presumptions required by law." ET § 13-608(b). This leads us to the conclusion that the intended burden of proof for a civil cause of action under the SAFE Act is preponderance of the evidence, which is the burden generally imposed in civil cases. *See, e.g., Coleman v. Anne Arundel Cnty. Police Dep't*, 369 Md. 108, 143 (2002) ("[C]onventional rules of civil litigation require that parties need only prove their case by a preponderance of the evidence[.]") (internal quotations omitted); *Mathis v. Hargrove*, 166 Md. App. 286, 310 n.5 (2005) ("The proper standard in a civil action . . . is the 'preponderance of the evidence' standard."); *Meyers v. Montgomery Cnty. Police Dep't*, 96 Md. App. 668, 691 (1993) ("The [Supreme Court of Maryland] first recognized that the preponderance of the evidence standard was generally applicable in civil and administrative proceedings.").

The legislative history of the Act further supports this conclusion. In identifying the need for the SAFE Act, the Task Force found that criminal actions had been ineffective at remedying issues of financial exploitation in part, because of the high burden of proof necessary to obtain a criminal conviction. *See* Written Statement of the Vulnerable Adult Financial Exploitation Task Force, *supra.* The Act's preamble reflects this, stating:

> *The heightened burden of proving guilt beyond a reasonable doubt in a criminal case*, the difficulty of proving exploitation when the victim may be older or infirm, and the limited remedies available to adult protective services and law enforcement further support the need for a solution *under civil law* to address the financial exploitation of susceptible adults and older adults[.]

18

2021 Md. Laws Ch. 311 (emphasis added). The repeated emphasis of the need for a *civil* law, coupled with the provision stating that the Act does not alter any burdens of proof required by law, suggests that the General Assembly wanted the general civil burden of proof to apply. This finding is confirmed by testimony presented before the Senate Judicial Proceedings Committee by Michael W. Davis, Chair of the Task Force. When testifying in support of the bill, Mr. Davis described the operation of the SAFE Act and said specifically that, "the burden of proof is reduced to that of the tort level of proof which is the preponderance of the evidence[.]" *SAFE Act: Hearing on S.B. 327 Before the S. Comm. on Jud. Procs.*, 2021 Leg., Reg. Sess. (Md. 2021) (statement of Michael W. Davis, Chair, Vulnerable Adult Exploitation Task Force). Therefore, Ms. Happer needed only to prove her claim of financial exploitation by a preponderance of the evidence.[10]

The SAFE Act gives a three-part definition of "financial exploitation" which specifies who can commit financial exploitation, what it includes, and what it does not include. Firstly, financial exploitation means an act taken by a person who:

> (i) Stands in a position of trust and confidence with a susceptible adult or older adult and who knowingly obtains or uses, or endeavors to obtain or use, a susceptible adult's or older adult's funds, assets, or property with the intent to temporarily or permanently deprive the susceptible adult or older adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the susceptible adult or older adult, in such a manner that is not fair and reasonable;

---

[10] "To prove by a preponderance of the evidence means to prove that something is more likely so than not so. In other words, a preponderance of the evidence means such evidence which, when considered and compared with the evidence opposed to it, has more convincing force and produces in your minds a belief that it is more likely true than not true." *Coleman*, 369 Md. at 125 n.16.

19

(ii) By deception, false pretenses, false promises, larceny, embezzlement, misapplication, conversion, intimidation, coercion, isolation, excessive persuasion, or similar actions and tactics, obtains or uses, or endeavors to obtain or use, a susceptible adult's or older adult's funds, assets, or property with the intent to temporarily or permanently deprive the susceptible adult or older adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the susceptible adult or older adult; or

(iii) Knows or should know that a susceptible adult or older adult lacks capacity to consent and who obtains or uses, or endeavors to obtain or use, the susceptible adult's or older adult's funds, assets, or property with the intent to temporarily or permanently deprive the susceptible adult or older adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the susceptible adult or older adult.

ET § 13-601(e)(1). Financial exploitation then includes:

(i) Breach of a fiduciary relationship resulting in the unauthorized appropriation, sale, or transfer of property;

(ii) Unauthorized taking of personal assets;

(iii) Misappropriation, misuse, or transfer of assets belonging to a susceptible adult or older adult from a personal or joint account; and

(iv) Intentional failure to effectively use a susceptible adult's or older adult's income and assets for the necessities required for the susceptible adult's or older adult's support and maintenance.

*Id.* § 13-601(e)(2).

What is *not* financial exploitation, however, is "an individual's *good-faith use* of a susceptible adult's or older adult's assets, including *for the purposes of establishing and implementing an estate plan intended to reduce taxes* or to maximize eligibility for public benefits in order to preserve assets for an identified or identifiable person." *Id.* § 13-601(e)(3) (emphasis added).

Mr. Bailey seeks the protection of section 13-601(e)(3) because the numerous payments he made to churches from Ms. Terrell's accounts would have made her eligible

20

for a reduction in taxes and therefore, he argues, his actions could not have been financial exploitation. Ms. Happer responds that, even though Ms. Terrell may have received a tax benefit for those payments, there was no evidence that the payments were made for that purpose. The circuit court ultimately agreed with Ms. Happer and found that Mr. Bailey had committed financial exploitation in violation of the SAFE Act, saying that he "took advantage of a vulnerable adult[.]" We see no clear error in that finding.

At trial, Charles Rains, a certified public accountant, was called to testify about his forensic analysis of Ms. Terrell's financial records. On cross-examination, Mr. Bailey's counsel asked Mr. Rains about the tax implications of charitable giving:

> Q: When a person makes a charitable contribution and they file their income tax return, are they likely to receive some "benefit" from the Government because of the those [sic] charitable contributions?
> A: Oh, a – yes, a benefit of a reduction of taxes.
> Q: And if contributions are made to churches and Ms. Terrell filed taxes or her taxes were filed for her, would you expect her to have received that tax benefit?
> A: Yes.
> Q: Have you ever seen any of Ms. Terrell's tax returns?
> A: I have not.

Ms. Terrell's tax returns were not presented by either party and were not entered into evidence. The only support for the assertion that Ms. Terrell received tax benefits from charitable giving came from Mr. Bailey's testimony:

> Q: Did you have anything to do with Ms. Terrell having her income tax returns prepared?
> A: No more other than when they came in I took 'em to her tax consultant.
> Q: And after the tax consultant prepared the returns, did you notice whether or not Ms. Terrell received any refunds?

21

> A: Her tax was done electronic filing, and a copy would come to her and the refunds would go to the bank. She always got a refund because she tithed, believing in tithing to the church.[11]

Mr. Bailey further testified that he made payments to churches from Ms. Terrell's accounts because he believed that she trusted him to do so because tithing was "what she's done over the years as far as [he knew]." Based on this testimony, Mr. Bailey claims that it was an error for the court to find that he committed financial exploitation within the meaning of the SAFE Act.

Whether an individual has committed financial exploitation is a question of fact, as is the determination of whether an individual was engaged in a "good-faith use of a susceptible adult's or older adult's assets[.]" Notably, as to the latter, the plain language of the statute imposes a state of mind requirement. The use of assets must be in "good-faith" and, if being used for a tax benefit, must be "*for the purposes of* establishing and implementing an estate plan intended to reduce taxes[.]" ET § 13-601(e)(3) (emphasis added). As such, an incidental tax benefit stemming from the use of assets is insufficient to shield an individual from liability for financial exploitation; the use of assets must be for that express purpose.

The only evidence offered here to demonstrate that Ms. Terrell did in fact receive a tax benefit for charitable giving and that Mr. Bailey's use of her assets was for that purpose was Mr. Bailey's own testimony. As fact-finder, the circuit court had no obligation to

---

[11] "Tithing" is defined as: "[t]he practice or an instance of giving usu. a tenth of one's earnings to the church or some other charitable recipient." Black's Law Dictionary (12th ed. 2024).

accept this evidence. *See Jones v. State*, 343 Md. 448, 460 (1996) ("In performing its fact-finding role, the trier of fact decides which evidence to accept and which to reject. . . . Moreover, it is the trier of fact that decides to what, if any, weight the evidence adduced is entitled."). As we have already discussed, it is clear from the court's remarks that the court did not find Mr. Bailey to be a credible witness.

Mr. Bailey's testimony must also be weighed against the evidence presented by Ms. Happer. Ms. Happer called Dr. Jeffrey Janofsky, a forensic psychiatry expert, who testified that Ms. Terrell began experiencing cognitive impairment as early as 2016 and opined that Ms. Terrell lacked mental capacity to execute the 2019 power of attorney and living will. Ms. Happer also offered the testimony of Jeffrey Payne, an expert forensic document examiner, who analyzed the signatures on the 2019 power of attorney and living will and concluded that they were not Ms. Terrell's. Based upon his forensic accounting, Mr. Rains testified as to the amounts that were taken from each of Ms. Terrell's bank accounts. In addition, Abigale Watson, the court-appointed guardian of Ms. Terrell's property, testified that, upon request, Mr. Bailey did not provide her with any receipts showing his expenditures while he was acting as Ms. Terrell's attorney-in-fact.

Ms. Happer demonstrated that Mr. Bailey assumed control of Ms. Terrell's finances at a time when she lacked the mental capacity to fully understand the ramifications of her actions, and that Mr. Bailey then withdrew tens of thousands of dollars from Ms. Terrell's accounts, without any accounting of how that money was spent, and donated tens of thousands of dollars more to his church—a church for which it was unclear whether Ms. Terrell was even a member. This was sufficient evidence to carry her burden of proving

that Mr. Bailey abused his position of trust and confidence and that it was more likely than not that Mr. Bailey's use of Ms. Terrell's assets was not in good faith. The circuit court was free to reject Mr. Bailey's testimony absolving himself and give it no weight if the court did not find him credible. The court's findings here were not clearly erroneous given the entirety of the evidence in the record.

## CONCLUSION

As a result of the foregoing, the judgment of the Circuit Court for Prince George's County is affirmed. We conclude that the trial court's consideration of the entire course of Mr. Bailey's conduct, including conduct which occurred before the SAFE Act's enactment, was not a retroactive application of the statute. The trial court did not improperly shift the burden of proof onto Mr. Bailey when it commented on his credibility and the lack of evidence surrounding his relationship with Ms. Terrell. Finally, in light of that credibility determination, the trial court did not err when it did not credit Mr. Bailey's testimony concerning his payments to churches and instead found by a preponderance of the evidence that Mr. Bailey committed financial exploitation.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

24